No. 93,762

WILLIE MCINTOSH, *Appellant*, v. SEDGWICK COUNTY, *Appellee*.

147 P.3d 869

Opinion filed December 8, 2006.

*John L. Carmichael*, of Wilson, Lee, Gurney, Carmichael & Hess, of Wichita, argued the cause, and *Steven R. Wilson*, of the same firm, was with him on the brief for appellant.

*Robert G. Martin, II*, of McDonald, Tinker, Skaer, Quinn & Herrington, P.A., of Wichita, argued the cause, and *Richard J. Liby*, of the same firm, was with him on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: Claimant was awarded workers compensation for total permanent disability because of an injury while employed as a security officer with Sedgwick County (the County). The Kansas Workers Compensation Board (the Board) correctly reduced his weekly benefits by the amount of other retirement benefits under the offset provisions under K.S.A. 2005 Supp. 44-501(h). However, the Board, in an effort not to eliminate the offset provisions, reduced his permanent and total disability award below the $125,000 statutory cap provided by law. The Kansas Court of Appeals reversed in *McIntosh v. Sedgwick County*, 34 Kan. App. 2d 684, 123 P.3d 740 (2005) (*McIntosh II*). We granted the County's petition for review and affirm the decision of the Court of Appeals.

In 1999, Willie McIntosh was 65 years old and working in Sedgwick County's Department of Security as a security officer. On June 25, 1999, McIntosh slipped and fell while he was making his rounds at the Sedgwick County Courthouse, resulting in severe injuries to his back and shoulder. Before the date of his injury, McIntosh had applied for retirement effective August 1, 1999.

McIntosh filed for workers compensation. The parties stipulated that at the time of his injury, McIntosh's average weekly wage was $637.46. This wage entitled him to a maximum applicable workers compensation rate of $366 per week.

On January 31, 2003, the administrative law judge (ALJ) entered a workers compensation award for McIntosh, finding that he was permanently and totally disabled.

The ALJ also found that the County could not offset McIntosh's award by the amount of his social security retirement benefits under K.S.A. 2005 Supp. 44-501(h). Sedgwick County appealed this award to the Board, which issued an order on July 31, 2003, affirming the ALJ's award. The County then appealed to the Court of Appeals, claiming that it should be allowed to offset McIntosh's social security retirement benefits. On June 11, 2004, the Court of Appeals held that the County was entitled to offset the retirement benefits and remanded the case to the Board with instructions to correct the amounts due McIntosh under the award. *McIntosh v. Sedgwick County*, 32 Kan. App. 2d 889, 91 P.3d 545, *rev. denied* 278 Kan. 846 (2004) (*McIntosh I*).

On December 13, 2004, the Board issued an order awarding McIntosh $30,847.74, to be paid in weekly increments for a period of 341.53 weeks. In reaching this sum, the Board recognized that the Kansas Workers Compensation Act (the Act) differentiated between permanent total disability awards and permanent partial disability awards by placing a $125,000 cap on the former and limiting the awards of the latter to a particular number of weeks. As the Board noted, "the reduction in compensation for retirement benefits cannot be accomplished in exactly the same way by simply reducing the weekly compensation for the weeks benefits are payable [as in partial disability cases]." To solve this discrepancy, the Board applied the following analysis to arrive at its award:

- Because the workers compensation statutes do not provide a specific number of weeks that a permanently and totally disabled employee should receive payment, the Board divided the statutory cap for such payments ($125,000) by the maximum weekly benefit McIntosh could receive under the Act ($366) to arrive at the number of weeks that McIntosh could receive benefits (341.53).
- The Board then offset this maximum weekly award of $366 by the weekly payments McIntosh received from his social security and KPERS retirement benefits to arrive at a weekly award. This analysis leads to four increments of payments:
  - June 25, 1999 (date of accident) - July 31, 1999: $141.46 per week for 5.14 weeks ($366 weekly compensation minus $224.54 in social security retirement benefits)
  - August 1, 1999 - August 19, 2000: $102.20 per week for 55 weeks ($366 weekly compensation minus $224.54 in social security and $39.26 in KPERS benefits)
  - August 20, 2000 - November 30, 2001: $102.20 per week for 66.86 weeks ($366 weekly compensation minus $224.54 in social security and $39.26 in KPERS benefits)
  - December 1, 2001 - approximately January 11, 2006: $82.35 per week for 214.53 weeks ($366 weekly compensation minus $244.39 in social security [increase in social security benefits as of December 1, 2001] and $39.26 in KPERS benefits)

The result of this order was that the statutory maximum compensation for total permanent disability, $125,000, was reduced by McIntosh's social security and KPERS retirement benefits over a period of 341.53 weeks. The practical effect of this reduction was that the maximum workers compensation benefits that McIntosh could receive for his permanent total disability was cut from $125,000 to $30,847.74. The Board stated in its award that "[t]o calculate the retirement reduction in any other manner would effectively dilute or eliminate the offset."

One Board member dissented from this decision, explaining:

"The undersigned Board Member respectfully dissents from the method the majority employs to calculate this permanent total disability award. I agree with

the majority that the retirement offset provisions in K.S.A. 1998 Supp. 44-501(h) are intended to and do reduce the amount of the weekly disability compensation. I disagree, however, that this weekly reduction likewise reduces the total dollar amount of permanent total disability compensation that is payable. Permanent total disability compensation, unlike permanent partial disability compensation, is subject only to a dollar limit, not to any time limit or fixed number of weeks. 'The payment of compensation for permanent total disability shall continue for the duration of such disability . . . .' As such, the weekly compensation in this case should continue, albeit at the reduced weekly rate, until the $125,000 maximum has been paid. I would not, as the majority has done, reduce both the amount of the weekly compensation and the $125,000 maximum by the amount of the retirement offset. Permanent total disability compensation is intended to be wage replacement. The purpose of the retirement offset is to avoid duplication of those benefits. This purpose is served by reducing the amount of the weekly benefit. It is not served by also reducing the number of weeks those weekly benefits are payable."

McIntosh appealed the Board's order to the Court of Appeals, which reversed the Board's decision in *McIntosh II,* 34 Kan. App. 2d at 693-94, holding that the offset provision in K.S.A. 2005 Supp. 44-501(h) reduces the weekly compensation for claimants with permanent total disabilities, but does not reduce the overall award to those recipients. The Court of Appeals explained that the offset provision in K.S.A. 2005 Supp. 44-501(h) serves only to delay the time it takes to reach the $125,000 cap, not to impose a cap on the number of weeks that compensation may be received. 34 Kan. App. 2d at 693.

## *DO THE OFFSET PROVISIONS OF K.S.A. 2005 SUPP. 44-501(h) REDUCE A CLAIMANT'S ENTIRE PERMANENT TOTAL DISABILITY AWARD UNDER THE KANSAS WORKERS COMPENSATION ACT ?*

The outcome of this case turns on the relationship of the offset provision in K.S.A. 2005 Supp. 44-501(h) to the other provisions in the Act that specifically address permanent total disability compensation. See K.S.A. 44-510c(a)(1) and K.S.A. 44-510f(a)(1).

The County argues that the plain language of K.S.A. 2005 Supp. 44-501(h) requires the *entire* workers compensation award—not just the weekly payments to a claimant—to be reduced by the other retirement benefits that a claimant receives. According to the

County, the interpretation offered by McIntosh and adopted by the Court of Appeals merely *delays*, rather than *reduces*, compensation payments, and thus is an incorrect interpretation of the statute. The County further argues that the Court of Appeals' interpretation will lead to unfair treatment of claimants with permanent partial disabilities and that it effectively eliminates any offset of wages, thereby thwarting the statute's purpose.

McIntosh agrees that the offset decreases his weekly compensation by the amount of his retirement benefits but disagrees that the offset reduces the total amount of benefits he is entitled to receive under the Act. He argues that the offset provision in 44-501(h) must be read in conjunction with the entire Act, which imposes no limitation on the duration of benefits for claimants with permanent total disabilities.

*Standard of Review*

The interpretation of statutory provisions in the Act is a question of law. This court's review of such questions is unlimited. *Foster v. Kansas Dept. of Revenue*, 281 Kan. 368, 374, 130 P.3d 560 (2006). However, under the doctrine of operative construction, the Board's interpretation of the Act is entitled to judicial deference. If there is a rational basis for the Board's interpretation, it should be upheld upon judicial review. *Foos v. Terminix*, 277 Kan. 687, 692-93, 89 P.3d 546 (2004).

Nevertheless, the Board's determination of questions of law is not conclusive and, though persuasive, is not binding on the court. *Foos*, 277 Kan. at 692-93. This court has explained that if the reviewing court finds that the administrative body's interpretation is erroneous as a matter of law, the court should take corrective steps. *Trees Oil Co. v. Kansas Corporation Comm'n*, 279 Kan. 209, 226, 105 P.3d 1269 (2005). The party challenging the Board's interpretation bears the burden of proving its invalidity. *Foos*, 277 Kan. at 693.

*Statutory Construction Under Kansas Law*

At issue in this case is proper interpretation of K.S.A. 2005 Supp. 44-501(h) of the Act with regard to permanent total disability com-

pensation. In cases such as this, which turn on a statutory question, this court has explained:

"It is a fundamental rule of statutory construction, to which all other rules are subordinate, that the intent of the legislature governs if that intent can be ascertained. The legislature is presumed to have expressed its intent through the language of the statutory scheme it enacted. When a statute is plain and unambiguous, the court must give effect to the intention of the legislature as expressed, rather than determine what the law should or should not be. Stated another way, when a statute is plain and unambiguous, the appellate courts will not speculate as to the legislative intent behind it and will not read such a statute so as to add something not readily found in it." *State ex rel. Stovall v. Meneley*, 271 Kan. 355, 378, 22 P.3d 124 (2001) (citing *In re Marriage of Killman*, 264 Kan. 33, 42-43, 955 P.2d 1228 [1998]).

At the same time, where "the face of the statute leaves its construction uncertain, the court may look to the historical background of the enactment, the circumstances attending its passage, the purpose to be accomplished, and the effect the statute may have under the various constructions suggested. [Citation omitted.]" *Robinett v. The Haskell Co.*, 270 Kan. 95, 100-01, 12 P.3d 411 (2000).

Courts ascertain the legislature's intent behind a particular statutory provision "from a general consideration of the entire act. Effect must be given, if possible, to the entire act and every part thereof. To this end, it is the duty of the court, as far as practicable, to reconcile the different provisions so as to make them consistent, harmonious, and sensible. [Citation omitted.]" *In re Marriage of Ross*, 245 Kan. 591, 594, 783 P.2d 331 (1989); see *State ex rel. Morrison v. Oshman Sporting Goods Co. Kansas*, 275 Kan. 763, Syl. ¶ 2, 69 P.3d 1087 (2003). Thus, in cases involving statutory construction, "courts are not permitted to consider only a certain isolated part or parts of an act but are required to consider and construe together all parts thereof *in pari materia*." *Kansas Commission on Civil Rights v. Howard*, 218 Kan. 248, Syl. ¶ 2, 544 P.2d 791 (1975).

Finally, when reviewing certain provisions or amendments to a statute,

"[i]t is presumed the legislature had and acted with full knowledge and information as to the subject matter of the statute, as to prior and existing law and legislation on the subject of the statute and as to the judicial decisions with respect

to such prior and existing law and legislation. [Citations omitted.]" *Rogers v. Shanahan*, 221 Kan. 221, 225, 565 P.2d 1384 (1976).

*Analysis*

This court has not yet had the opportunity to determine how K.S.A. 2005 Supp. 44-501(h) of the Act should apply to permanent total disability claimants. That section, which generally requires that workers compensation benefits be offset by other retirement benefits, states:

> "If the employee is receiving retirement benefits under the federal social security act or retirement benefits from any other retirement system, program or plan which is provided by the employer against which the claim is being made, any compensation benefit payments which the employee is eligible to receive under the workers compensation act for such claim shall be reduced by the weekly equivalent amount of the total amount of all such retirement benefits, less any portion of any such retirement benefit, other than retirement benefits under the federal social security act, that is attributable to payments or contributions made by the employee, but in no event shall the workers compensation benefit be less than the workers compensation benefit payable for the employee's percentage of functional impairment." K.S.A. 2005 Supp. 44-501(h).

This court has explained that the purpose of this offset provision, adopted in 1993, was "to prevent wage-loss duplication." *Wishon v. Cossman*, 268 Kan. 99, 106-07, 991 P.2d 415 (1999).

The parties' disparate interpretations of the provisions of K.S.A. 2005 Supp. 44-501(h) find support in the plain language of the statute. The County correctly points out that the statute states that "any" compensation benefit payments "shall be reduced" by a claimant's weekly retirement benefits, indicating the entire award should be reduced by the offset. On the other hand, section 501(h) states that benefit payments "shall be reduced by the *weekly* equivalent" of a claimant's other retirement benefits, indicating that it was only intended to offset the claimant's weekly payment amount, not the entire workers compensation award. This ambiguity is only resolved by consideration of other provisions of the Act dealing with the same subject matter.

K.S.A. 44-510c delineates the framework under which claimants with permanent total disabilities may receive workers compensation. That statute states in relevant part:

"Where permanent total disability results from the injury, weekly payments shall be made during the period of permanent total disability in a sum equal to 66⅔% of the average gross weekly wage of the injured employee, computed as provided in K.S.A. 44-511 and amendments thereto, but in no case less than $25 per week nor more than the dollar amount nearest to 75% of the state's average weekly wage, determined as provided in K.S.A. 44-511 and amendments thereto, per week. *The payment of compensation for permanent total disability shall continue for the duration of such disability,* subject to review and modification as provided in K.S.A. 44-528 and amendments thereto." (Emphasis added.) K.S.A. 44-510c(a)(1).

The only express limitation on this statement in the Act is found in K.S.A. 44-510f(a)(1), which limits the total compensation received "[f]or permanent total disability, including temporary total, temporary partial, permanent partial and temporary partial disability payments paid or due, [to] $125,000 for an injury or any aggravation thereof." The action of the Board in this case had the direct effect of undermining the plain language of K.S.A. 44-510c(a)(1).

The pertinent language in section 510c(a)(1) was adopted in 1974, 19 years prior to the adoption of the offset provision in section 501(h) in 1993. L. 1974, ch. 203, sec. 12. The County argues that the later enactment evidences an intent to impose a limitation on the duration of permanent total disability awards. However, this court has explained that the legislature is presumed to enact laws with full knowledge of the existing law. *Rogers*, 221 Kan. at 223-24. Furthermore, this court seeks to reconcile different provisions of the same Act so they have "consistent, harmonious, and sensible" interpretations. *In re Marriage of Ross*, 245 Kan. at 594 (citing *State v. Adee*, 241 Kan. 825, 829, 740 P.2d 611 [1987]). In the absence of specific language in section 501(h), we may not ignore the plain language of 510c(a)(1): "The payment of compensation for permanent total disability shall continue for the duration of such disability."

A comparison to previous versions of the Act provides support for the Court of Appeals' decision. Unlike the current statute, past versions of the Act did not allow for compensation to permanently and totally disabled claimants for the duration of their disability. See K.S.A. 44-510(3)(a) (Corrick 1964) (limiting payments for per-

manent total disabilities to 8 years from the date of injury); K.S.A. 44-510c(a) (Weeks 1973) (limiting payments for permanent total disabilities to 415 weeks from the date of injury). "When the legislature revises an existing law, it is presumed that the legislature intended to change the law as it existed prior to the amendment. [Citation omitted.]" *Kaul v. Kansas Dept. of Revenue*, 266 Kan. 464, 471, 970 P.2d 60 (1998), *cert. denied* 528 U.S. 812 (1999). The fact that the legislature amended the Act in 1974 to mandate that compensation to permanent total disability claimants extend for the duration of their disability—and the continued existence of that mandate—gives credence to McIntosh's contention and the Court of Appeals' decision that the legislature did not intend for the offset provision to place a time limit on those disability benefits.

In addition to the language in section 510c, the differences between the Act's treatment of permanent *total* disability compensation and permanent *partial* disability compensation also support a finding that the offset provision in section 501(h) was not intended to impose a maximum duration for permanent total disability awards. While section 510c(a)(1) states that "[t]he payment of compensation for permanent total disability shall continue for the duration of such disability," awards for permanent partial disabilities *are* subject to maximum time limitations. K.S.A. 44-510e limits payments of permanent partial disabilities (not covered by the specific award designations in K.S.A. 44-510d) to a maximum period of 415 weeks, with the actual period to be determined by multiplying 415 by the percentage of disability that the claimant has incurred as a result of his or her accident. For example, a person with a 50% disability will receive compensation for a maximum of 415 weeks x 50% disability = 207.5 weeks.

The County contends that reading the Act's offset provision to reduce only the weekly payments to permanently and totally disabled claimants, rather than to impose a time limit on the duration of this compensation, results in unfair treatment of claimants with permanent partial disabilities, who only receive benefits for a designated length of time. Thus, according to the County's argument, McIntosh's proposed interpretation of the offset provision would reduce the total award to permanent partial disability claimants,

but would only delay the receipt of the award for claimants with permanent total disabilities. The County claims that "[i]f the Legislature wanted to apply the offset differently to permanently and totally disabled claimants, it could have so specified when it enacted the offset in 1993, but it did not." On the contrary, it argues, only reading the offset provision as a reduction of the *entire* award would eliminate this discrepancy.

The problem with the County's argument was considered in detail by the Court of Appeals below:

"In addressing the County's argument, we point out that employees suffering a permanent total disability are treated differently under the Act than employees who have a permanent partial disability. Workers compensation benefits for a permanent partial scheduled disability are paid for a set number of weeks as determined under K.S.A. 44-510d. Workers compensation benefits for a permanent partial disability are paid based on the formula set forth in K.S.A. 44-510e and such payments shall not exceed 415 weeks. See K.S.A. 44-510e(a). An employer's liability for permanent partial disability benefits is subject to a $100,000 cap and to a $50,000 cap when only functional impairment is awarded. K.S.A. 44-510f(a)(3) and (4). Thus, workers compensation benefits for a permanent partial disability are limited to a certain period of time subject to the statutory cap on an employer's liability. On the other hand, workers compensation payments for a permanent total disability continue for the length of the disability or until the $125,000 cap has been met, whichever event occurs first." *McIntosh II*, 34 Kan. App. 2d at 692-93.

We agree with the Court of Appeals. The Workers Compensation Act mandates that the two groups be treated differently, independent of the offset provision. Sections 510d and 510e limit the duration of partially-disabled claimants' compensation to a specified number of weeks. No corresponding time limitation is placed on awards to claimants with permanent total disabilities under the Act, and no limitation should be externally imposed by the courts. One only has to read the definition of permanent total disability to understand the reasons why the legislature differentiated between the two groups. See K.S.A. 44-510c(a)(2).

The County cites *Wishon v. Cossman*, 268 Kan. 99, and *McFall v. United Parcel Service*, No. 92,090, unpublished opinion filed March 25, 2005, in support of its interpretation of section 501(h). *Wishon* involved, in relevant part, a question regarding the appli-

cation of the offset provision to social security disability benefits that were converted to retirement benefits when the claimant turned 65. 268 Kan. at 106. Because the primary issue in *Wishon* concerned the employer's subrogation lien, the opinion does not state the nature of the claimant's disability (whether the claimant was permanently and totally disabled, permanently and partially disabled, etc.). In its petition for review, the County points out that the *Wishon* court does not distinguish between permanent total and permanent partial disability compensation. Instead, the County asserts, the court merely stated that "[a] compensation award will be reduced by the amount of the social security benefits . . . . The purpose of this reduction is to prevent wage-loss duplication." (*Wishon*, 268 Kan. at 106).

The problem with the County's reliance on *Wishon* is that, while it is true that *Wishon* did not state that compensation awards for permanent total disabilities are *not* subject to some duration limitation, it also did not indicate that the offset provision provides such a limitation. The County latches on to ambiguous and broad language (dicta) stating: A compensation award will be reduced by the amount of the social security benefits. This ambiguous statement does not support the County's claim, particularly in light of the statutory provisions to the contrary.

Similarly, in *McFall,* the Court of Appeals affirmed the Board's decision involving a permanent total disability award. The claimant was injured in the scope of his employment, but, at the time of his injury, his weekly retirement benefit exceeded his weekly income. Because of the surplus of his retirement benefits, the Board awarded McFall the minimum payment of functional impairment. However, because McFall *was* permanently and totally disabled, the Board found that his award was not limited by the $50,000 cap in K.S.A. 44-510f(a)(4) (for functional impairment), but instead was only subject to the $125,000 cap in K.S.A. 44-510f(a)(1) (for permanent total disability).

In its petition for review, the County argues that the maximum payments that McFall could receive as a result of the Board's decision was $89,338.08—well below the $125,000 maximum. Thus, according to the County, "[t]he claimant [in McFall] would never

reach the statutory cap because his retirement benefits reduced his Award."

This statement is true in a very loose sense. Because McFall's weekly compensation payment was completely offset by his retirement benefits, his weekly compensation would remain at zero (excluding the functional disability payment) as long as he received those retirement benefits. Thus, his compensation was practically capped at the sum of his functional impairment and any other temporary benefits he might have received.

The outcome in *McFall*, contrary to the County's claim, is not inconsistent with a conclusion of the Court of Appeals' decision that the offset provision in section 501(h) does not place a limitation on the length of time that a claimant with a permanent total disability may receive payments. Technically speaking, McFall will receive nothing in offset weekly compensation. The language of the appellate court in *McFall*, admittedly not binding on this court, provides no indication that its decision should be read as placing a limitation on the duration of permanent total disability benefits. In fact, the tone of that opinion is one of expanding benefit payments to disabled claimants, not limiting them.

Finally, the County argues that the Court of Appeals' decision "effectively eliminates the objective" of the offset provision to "eliminate wage-loss duplication." "The purpose of the . . . 44-501(h) offset provision is to prevent wage-loss duplication. [Citation omitted.]" *Wishon,* 268 Kan. at 108. The County states that the Supreme Court has not differentiated previously in its discussions of the purpose of section 501(h) between permanent total and permanent partial disability. According to the County, because the Court of Appeals' interpretation of the statute *delays* rather than *reduces* the award, this interpretation does not prevent the duplication of wage-loss compensation.

This court explained the purpose of a previous offset provision with regard to death benefits in *Baker v. List and Clark Construction Co.*, 222 Kan. 127, 563 P.2d 431 (1977). In that case, the court quoted at length from a treatise on workers compensation, explaining:

" 'Once it is recognized that workmen's compensation is one unit in an overall system of wage-loss protection, rather than something resembling a recovery in tort or on a private accident policy, the conclusion follows that duplication of benefits from different parts of the system should not ordinarily be allowed. Since most social legislation in the United States has appeared in unrelated fragments, lack of coordination resulting in cumulation of benefits is quite common; but newer legislation, including the Social Security compensation offset provision, is more carefully drawn to prevent this result.' 4 A. Larson, The Law of Workmen's Compensation, Sec. 97.00 (1976).

. . . .

" 'Wage-loss legislation is designed to restore to the worker a portion, such as one-half to two-thirds, of wages lost due to the three major causes of wage-loss: physical disability, economic unemployment, and old age. The crucial operative fact is that of wage loss; the cause of the wage loss merely dictates the category of legislation applicable. Now if a workman undergoes a period of wage loss due to all three conditions, it does not follow that he should receive three sets of benefits simultaneously and thereby recover more than his actual wage. He is experiencing only one wage loss and, in any logical system, should receive only one wage-loss benefit. This conclusion is inevitable, once it is recognized that workmen's compensation, unemployment compensation, nonoccupational sickness and disability insurance, and old age and survivors' insurance are all parts of a system based upon a common principle. If this is denied, then all coordination becomes impossible and social legislation becomes a grab-bag of assorted unrelated benefits.' *Id.* at Sec. 97.10." *Baker*, 222 Kan. at 130-31.

The above language was also quoted in part by the Court of Appeals. *McIntosh II*, 34 Kan. App. 2d at 689-90 (quoting 9 Larson's Workers' Compensation Law § 157.01 [2000]).

Contrary to the County's assertions, the purpose of preventing wage-loss duplication is not frustrated by allowing a claimant with a permanent total disability to recover an offset award for the duration of his or her disability, as required by K.S.A. 44-510c(a)(1). Rather, this purpose is best served by reducing a claimant's weekly compensation payments by his or her retirement benefits (also intended as wage replacements). Placing a time limit on the number of weeks that a claimant may receive such benefits does nothing toward preventing duplication of wages and runs counter to the express provisions of K.S.A. 44-510c(a)(1).

*Conclusion*

The Court of Appeals was correct in overturning the Board's interpretation of K.S.A. 2005 Supp. 44-501(h). This conclusion is

mandated by the language of the Act, which unequivocally states that "[t]he payment of compensation for permanent total disability shall continue for the duration of such disability." K.S.A. 44-510c(a)(1). Any limitation on the duration of benefit payments for other levels of disability comes not from the offset provision in section 501(h), but from the other sections of the Act that relate to those disabilities. See, *e.g.*, K.S.A. 44-510d and 44-510e. This interpretation is completely in harmony with the other provisions of the Act, as well as the purpose of the offset provision, which is to prevent wage-loss duplication.

Affirmed.