(167 P.3d 801)
No. 97,091

GAIL E. COONCE, *Appellant*, v. JIM GARNER, SECRETARY OF THE
KANSAS DEPARTMENT OF LABOR, *Appellee*.

Opinion filed September 28, 2007.

*Paul D. Post*, of Topeka, for the appellant.

*Brett A. Flachsbarth*, of Kansas Department of Labor, for the appellee.

Before CAPLINGER, P.J., ELLIOTT, J., and BUKATY, S.J.

BUKATY, J.: This case involves a judicial review of an agency action under K.S.A. 77-601 *et seq.* The Kansas Department of Labor (KDOL) found that Gail E. Coonce had violated K.S.A. 44-5,120 by making several false or misleading statements and misrepresenting material facts regarding his disability while attempting to obtain workers compensation benefits. It assessed a fine of $20,000. The district court upheld the determination. Coonce now appeals. He raises three issues: (1) Is there sufficient evidence to support KDOL's findings, (2) did the KDOL correctly interpret a statute in concluding that each statement Coonce made in a single deposition constituted an independent act of fraud or abuse, and

(3) was KDOL's determination otherwise arbitrary and capricious? We find in favor of KDOL on all issues and affirm.

A rather detailed recitation of the facts, especially excerpts from Coonce's deposition, is necessary for an understanding of the arguments and issues on appeal.

On February 20, 2002, Coonce was injured during his employment as an electronic service technician with Cytek Media Systems (Cytek). While working on a project for the company near Springfield, Missouri, Coonce was attempting to unload heavy equipment when he felt pain in his lower back and was unable to move for an extended period of time. He contacted his supervisor and informed him about the injury on the same day it occurred. He subsequently filed a workers compensation claim against Cytek. Neither Cytek nor its insurer have ever disputed that Coonce suffered an injury on the job and was entitled to workers compensation benefits as a result.

When Coonce returned to Topeka, he sought medical treatment. Doctors diagnosed the injury as a ruptured disc in his lower back. After trying several different treatment options that had little or no effect, Coonce underwent surgery in February 2003 on his back for the removal of the herniated disc and fusion at the L4-5 level. The total cost of this treatment amounted to $84,602.98, which was paid by Cytek and its insurance carrier. Coonce also received temporary total disability benefits in the amount of $37,606.20 (at a rate of $441.05 per week).

In July 2003, the surgeon who performed the surgery rated Coonce at maximum medical improvement. He has not returned to work since his injury.

On October 9, 2003, Dr. James Warren, Jr., who had been treating Coonce since January, made the following observations regarding Coonce's physical restrictions: "I basically restrict the patient to sedentary work. No lifting, bending and no twisting, nothing greater than ten pounds. I also recommend that he wear his back brace during activities." Dr. Warren also found that Coonce had attained maximum medical improvement.

At the request of Cytek's insurance carrier, an independent investigator performed video surveillance of Coonce at his home in

the fall of 2003. Specifically, on October 12, Coonce was video-taped performing cement work on his driveway. Coonce began the work in the morning by driving to an equipment rental store to get a cement mixer. He left the home again and returned with bags of concrete mix. The video showed Coonce lifting bags of cement mix and pouring the contents of the bags into a cement mixer, pushing a wheelbarrow, moving the cement mixer, shoveling, bending, and squatting. Coonce performed these activities without a cane over a 3- to 4-hour time period.

On December 23, 2003, Coonce gave a deposition in conjunction with the workers compensation proceeding. Coonce was unrepresented by counsel at the deposition, and the examination was videotaped. During the course of the deposition, Coonce was questioned by Clifford Stubbs, an attorney for Cytek's insurance company, with whom the following exchanges took place:

"Q. Whether with a cane or without a cane, how long are you able to be on your feet, or how long have you been able to be on your feet since July of 2003, at any one time?

"A. Two hours max.

"Q. And to your knowledge, what were you able to do for two hours, since July of 2003, where you were on your feet that long?

"A. Standing in the garage. I have a—six televisions, six different channels, and I stand there with my cane. I don't sit in the garage. I go out there to watch a little TV, take the dogs out there with me. I might have been standing there two hours maybe. That's pushing it.

"Q. If you're on your feet that long, what type of symptoms do you have?

"A. Sharp feet pain, lower back pain. And again, the tension in the back reaching the point of a migraine.

"Q. If you're on your feet that long, does your pain become excruciating?

"A. Yes.

. . . .

"Q. What about bending? Since July of 2003, have you been able to bend?

"A. Not very far forward at all. I said I could pick up that cane, but I would do it by bending my knees and grabbing a hold of the table and pulling myself back up. The answer would be 'no' on bending.

. . . .

"Q. What's the heaviest thing that you're able to lift without pain?

"A. That notebook. A gallon of milk is too much.

"Q. What type of pain complaints do you have when you lift a gallon of milk?

"A. The lower back gets more pain in it; and then when that happens, the leg is tied right to it. The leg gets more pain in it.

"Q. When that happens, do you have excruciating pain that you have to set it down, set the gallon of milk down and immediately go sit down or lie down?

"A. Uh-huh.

"Q. Is that a yes?

"A. Yes.

"Q. And has that been, you know, consistent since July of 2003?

"A. Yes.

"Q. Are you able to twist at all? Do you have any difficulties with twisting?

"A. I can't twist.

"Q. What other physical tasks do you have difficulty performing?

"A. Putting my shoes on, putting my pants on, taking a shower, riding in a vehicle.

. . . .

"Q. What other physical activities does your back pain or the other pain that you have told me about, prevent you from doing?

"A. Well, I haven't had sex for two years, because I have no feeling. Gosh, I used to, you know, work on my own car. I used to do a lot of things. Shoot a few basketballs with my daughter, and all that is gone. I'm just—

"Q. Let's focus on some of those things around the house. Are you able to mow your yard—or do you have a yard, should be my first question?

"A. Yeah, we have a yard.

"Q. Are you able to mow the yard?

"A. No. I have tried. I even bought a riding mower; but it makes me flair up as with any activity.

. . . .

"Q. Are you able to shovel the driveway, if there's snow?

"A. No.

"Q. Are you able to rake leaves, if the leaves need to be raked?

"A. No. No. I've tried, it makes me flair up also.

"Q. Are you able to do any home improvement projects?

"A. No. No, I can piddle for short periods of time.

. . . .

"Q. In your opinion, what's the most active thing that you have done since February 20 of 2003, and how long were you able to do it?

"A. I would have to say going to Physical Therapy and my uncle's funeral, where we drove—it was a half hour, 45 minutes there. I went to the funeral. Didn't go to the cemetery. Drove back the half hour, 45 minutes. Migraine headache, vomiting, that situation, by the time I get home.

"Q. Anything else more active than that, because that frankly doesn't sound very active?

"A. I know. It's riding in a car, though; it's bumping. If you could feel the pain in my back right now, a little bump, you know, makes it worse. I think that's why a vehicle does it, or even out and walking. No, sir."

Coonce later added to this answer by way of an errata sheet, where he explained:

"I've been to physical therapy—18 times; I've tried a lot of things. I've also taken about 900 pills per month. I have some days better than others, but the bad days far outnumber the good. When I take Oxycontin I do get some pain relief, but my speech is slurred; I loose [sic] coordination; I bump into things; I get very anxious & nervous & dizzy. Then it wears off and I hurt worse.

. . . .

"Q. Mr. Coonce, in your opinion, are you able to perform any type of work?
"A. No.
"Q. And we've—
"A. I mean I could do anything for five or ten minutes. I could do anything for an hour, sit here and talk to you; but I'm worried about getting back home now, the longer we sit here, because if I get a migraine on the road, that's about all—I'll take some meds, when I get out of this meeting. I can do anything for a little while—not anything, but I can do little things. I can [piddle] for a little while.
"Q. When you say 'a little while,' what are you talking about?
"A. Get up this morning, take a shower, get dressed. That's the maximum, taking a shower. I was ready to call you and say forget it. Take some more medicine. Do it. So a shower is one of the roughest things I can do right now. But I can't stop showering, you know. Does that answer your question?
"Q. Are you optimistic, or do you have any thought or understanding about whether or not you will be able to obtain work in the future?
"A. I'm still optimistic. I'm only 42. I am more optimistic than my surgeon, Dr. Smith, is though. He has stated six months, maximum medical improvement. You're probably going to be like that for the rest of your life."

In addition to these statements, the attorney asked Coonce to stand to demonstrate his own physical abilities on the videotape. According to the transcript, Coonce described himself as "stiff" and took a long time to stand from his chair, while he put "significant weight" on his cane. Dr. Smith, who later viewed the videotaped deposition, described Coonce as "showing himself to be extremely disabled" when he attempted to stand.

At the close of the deposition, the insurance company's attorney questioned Coonce regarding the truthfulness of his answers and discussed Coonce's right to review the deposition transcript and clarify any answer asked him if needed:

"Q. And have you done, as best you can, to accurately, truthfully and honestly describe your physical complaints and physical abilities since the accident?
"A. Yes.

"Q. Mr. Coonce, you have the right, under our procedure, in Missouri and Kansas, to read the deposition transcript and make sure that she's taken down my questions accurately and your answers accurately. You can either exercise that right, and she'll send a copy of that transcript to you with directions on what you should do, or you can waive that right.

"And given the fact that you commented earlier that you have been taking some pain medication— you said you didn't think it would affect your ability to understand my questions and testify truthfully and honestly—I would request that you exercise your right to read and sign the deposition transcript. Is that acceptable to you?

"A. Yes."

When Coonce received the deposition transcript, he filled out several errata sheets in which he clarified his deposition answers. However, he did not alter the substance of his answers regarding his physical ability after July 2003, and specifically did not relate any information about the driveway work he had performed in October. Coonce signed off on the transcript and corrections on January 28, 2004.

After receiving the signed transcript and errata sheets from Coonce, the insurance company's attorney consulted his physicians to get their opinions as to whether Coonce had accurately portrayed his physical disability during the deposition. In a letter dated April 13, 2004, Dr. Smith, Coonce's surgeon, explained:

"I have met today with Mr. Clifford K. Stubbs. I have reviewed a video tape of Mr. Coonce on October 12, 2003, showing him doing a fair amount of construction work the entire morning. He was laying what appears to be a patio with cement. In addition, I have seen portions of a deposition dated December 23, 2003, specifically I did see a portion of that deposition when Mr. Coonce tried to demonstrate his ability to stand up. The two do not appear equal. On the video tape in October, he is doing a significant amount of work and then in December, two and a half months later, he is showing himself to be extremely disabled. This is very tough. There does seem to be some discrepancy between his deposition and how he was on October 12, 2003."

In addition, Dr. Warren made the following observations regarding Coonce in a letter dated May 21, 2004:

"After reviewing the videotape, which was done on 10/12/2003, knowing that it was performed three days after my evaluation, which was done on 10/09/2003, my impression is the following:

"1. That the patient does not have a failed back and does not meet the criteria for failed back syndrome. He clearly has had a good outcome from the surgery performed by Dr. Smith.

"2. That the patient clearly fits the diagnosis of malingering. The patient clearly is deceiving his caregivers for secondary gain. The patient says that he is unable to do sedentary work. However, in this videotape, he is observed doing heavy-duty labor for approximately 3 to 4 hours.

"3. My percent impairment would be reduced to 10% or less by AMA guides based on the percent impairment, which would be given for a surgical procedure of the lumbar spine.

"4. I am raising the patient's activity level, recommending that the patient can return to work full duty and can even participate in heavy-duty labor."

In October 2004, the following "progress report" was added to Dr. Warren's records after a visit from Coonce:

"This is a gentleman who follows up with me hostile and angry with me because I decreased my disability evaluation percentage down to 10% based on a video tape that was shown to me of Mr. Coonce going [*sic*] heavy duty labor building a patio doing cement work, bending, twisting, lifting cement bags, turning a cement mixer. This work went on for about 4 hours. The patient prior to that has asked me to write a note saying that he could not do any type of work, not even sedentary. I pointed out to the patient that after he wrote this note and asked me this question about whether or not I could state that he could not do any work at all, the patient is seen on this video tape going [*sic*] heavy duty labor."

In addition, Coonce's testimony during the deposition that he and his wife had not had sex "for two years" appeared inconsistent with the records of Dr. Christopher T. Balcezak, Coonce's urologist. In a "Progress Note" dated August 7, 2003, Dr. Balcezak observed that "[Coonce] and his wife are currently sexually active several times a month. His wife is currently using oral contraception, and the patient and his wife would like to have a more permanent solution."

Based on this information, Cytek's insurance company filed a complaint with the Fraud and Abuse Investigation Section of the Kansas Division of Workers Compensation. The Director of the Fraud and Abuse Unit then issued a summary order finding that Coonce had violated K.S.A. 44-5,120(d)(4)(A) and (B) by making false statements regarding his physical abilities during the deposition. The Director assessed a fine of $20,000 for Coonce's actions, citing K.S.A. 44-5,120(g).

Following Coonce's request for a hearing to determine the validity of the summary order, a hearing officer upheld the order. Among other things, the officer found:

"11. The respondent's willful, knowing or intentional misrepresentation or concealment of a material fact is shown when comparing the respondent's deposition testimony and his statements to medical providers coupled with the video surveillance taken of the respondent. The sequence of the statement, testimony and the video surveillance supports the conclusion that the respondent could and did perform physical acts that he claimed he was unable to perform without severe pain or because of the impairment caused by his injury.

. . . .

"13. The state has proven that Respondent committed at least ten violations of K.S.A. 44-5,120(d)(4)(A) and (B) and pursuant to K.S.A. 44-5,120(g)(1) should be fined $2,000.00 for each violation."

Based upon these conclusions, the hearing officer assessed a fine against Coonce in the total amount of $20,000.

Coonce filed a petition for review with the Kansas Secretary of Labor which was denied. He then filed a petition for review with the district court, alleging that KDOL's decision was not supported by substantial evidence and the agency had incorrectly interpreted K.S.A. 44-5,120(g) in assessing the fine against him. The court affirmed all the findings.

Our analysis begins with a consideration of our standard of review. Judicial review of KDOL's determination that Coonce violated the fraud and abuse sections of the Workers Compensation Act (Act) is governed by K.S.A. 77-621. On appeal, a reviewing court may not substitute its judgment for that of an administrative agency. It is restricted to considering whether, as a matter of law, (1) the administrative agency acted fraudulently, arbitrarily, or capriciously, (2) the agency's administrative order is supported by substantial evidence, and (3) the agency's action was within the scope of its authority. *Lacy v. Kansas Dental Board*, 274 Kan. 1031, 1040, 58 P.3d 668 (2002).

This case requires us to consider the proper interpretation of K.S.A. 44-5,120(d) and (g), and then to apply that interpretation to the facts of this case to determine whether the Fraud and Abuse Unit was correct in finding that Coonce violated those sections of the statute in his deposition testimony in December 2003. In doing

so, we must utilize a combination of standards of review which are interrelated: whether the decision is supported by substantial evidence, whether the agency correctly interpreted the statute in assessing the fines against Coonce, and whether the agency decision was otherwise arbitrary and capricious.

Substantial evidence in workers compensation cases is evidence that possesses something of substance and relevant consequence and which induces the conclusion that the award is proper. It is evidence which furnishes a substantial basis of fact from which the issue raised can be reasonably resolved. The appellate court reviews the evidence in the light most favorable to the prevailing party and does not reweigh the evidence or assess the credibility of the witnesses. *Neal v. Hy-Vee, Inc.*, 277 Kan. 1, 16-17, 81 P.3d 425 (2003). An appellate court will uphold findings supported by substantial evidence even though evidence in the record would have supported contrary findings. *Poff v. IBP, Inc.*, 33 Kan. App. 2d 700, 706, 106 P.3d 1152 (2005).

On the issue of KDOL's interpretation of statutes, the interpretation of the Act (of which K.S.A. 44-5,120 is a part) is a matter of law over which an appellate court's review is unlimited. *McIntosh v. Sedgwick County*, 282 Kan. 636, 641, 147 P.3d 869 (2006). Under the doctrine of operative construction, "the Board's interpretation of the Act is entitled to judicial deference. If there is a rational basis for the Board's interpretation, it should be upheld." 282 Kan. at 641 (citing *Foos v. Terminix*, 277 Kan. 687, 692-93, 89 P.3d 546 [2004]).

Finally, as to whether KDOL acted arbitrarily and capriciously, a "rebuttable presumption of validity attaches to all actions of an administrative agency and the burden of proving arbitrary and capricious conduct lies with the party challenging the agency's action. [Citation omitted.]" *Kaufman v. Kansas Dept. of SRS*, 248 Kan. 951, 961, 811 P.2d 876 (1991).

Turning to the issues raised by Coonce, he first argues that the hearing officer's determination that he had committed several fraudulent or abusive acts as defined by K.S.A. 44-5,120(d)(4)(A) and (B) was not supported by substantial evidence. In particular, he asserts that the statute should not apply to him, because (1) he

did not receive any benefits as a result of his testimony at the deposition, and (2) his testimony involved "his subjective beliefs as to his condition and as a consequence are not 'facts.' "

K.S.A. 44-5,120 provides in relevant part:

"(d) Fraudulent or abusive acts or practices for purposes of the workers compensation act include, willfully, knowingly or intentionally:

. . . .

(4) obtaining, denying or attempting to obtain or deny payments of workers compensation benefits for any person by:

(A) Making a false or misleading statement;

(B) misrepresenting or concealing a material fact."

As to Coonce's contention that he obtained no benefits from his deposition testimony, the plain language of the statute renders that fact irrelevant if he "attempt[ed] to obtain . . . workers compensation benefits for any person" by the means prohibited by the statute. "When a statute is plain and unambiguous, the court must give effect to the intention of the legislature as expressed." *State ex rel. Stovall v. Meneley*, 271 Kan. 355, 378, 22 P.3d 124 (2001).

It is true that the final award of compensation for Coonce's injury came after the fraud and abuse assessment against him. It is also true that he had already received medical benefits and temporary total benefits before he gave his deposition testimony. However, the language in the award reveals that the administrative law judge (ALJ) found that Coonce had "misrepresented the extent of disability following surgery" in order to remain home and obtain a more generous award based on his wage loss. These comments in the award make it clear that Coonce would likely have received a greater award for wage loss and work disability had his misrepresentations gone undetected.

The plain language of K.S.A. 44-5,120(d)(4) supports the agency's determination that Coonce's conduct fell within the scope of that statute, which states that making misrepresentations while "attempting to obtain . . . workers compensation benefits" is a violation of the Act.

As to Coonce's contention that his statements were merely his subjective assessment of his condition or at the most were exaggerations of his condition and not violations of the statute, he es-

sentially is asking this court to reweigh the evidence. We decline to do so. It is the role of this court when reviewing an agency decision to review the evidence in the light most favorable to the prevailing party. See *Neal*, 277 Kan. at 16-17. Here, Coonce made several deposition statements that contrasted sharply with his conduct demonstrated on the videotape taken 2 months earlier. We note that several of the doctors mentioned that Coonce had also misrepresented his condition to them based upon the conduct they observed in the video.

As to his claim of exaggeration, we simply note that the nature and extent of an injured workers work-related disability is often at the heart of a workers compensation claim. If Coonce exaggerated the extent of his injuries here, he necessarily misled the doctors who would rate him and also the judge who would determine his award.

More than substantial evidence supports KDOL's and the district court's determination that Coonce's statements violated K.S.A. 44-5,120(d)(4)(A) and (B).

Coonce next argues that even if there was substantial evidence to support KDOL's determination that he violated K.S.A. 44-5,120(d)(4)(A) and (B), the agency incorrectly assessed fines against him for each of his misleading statements during the deposition instead of treating the entire deposition as one violation of the Act. He claims the maximum fine against him should be $2,000.

KDOL assessed the $20,000 fine against Coonce pursuant to K.S.A. 44-5,120(g)(1), which states:

"(g) If, after such hearing, the director . . . determines that the person or persons charged have engaged in a fraudulent or abusive act or practice the director . . . shall issue an order or summary order requiring such person to cease and desist from engaging in such act or practice and, in the exercise of discretion, may order any one or more of the following:

(1) Payment of a monetary penalty of not more than $2,000 for each and every act constituting the fraudulent or abusive act or practice, but not exceeding an aggregate penalty of $20,000 in a one-year period."

Coonce provides no authority for his claim that the deposition should be viewed as one "statement" for purposes of the Act, and the legislative history on the Act is silent as to the point. Further,

his argument fails when viewed in the context of the plain language of K.S.A. 44-5,120. Subsection (d)(4) of the statute defines "[f]raudulent or abusive acts or practices" as "obtaining, denying or attempting to obtain or deny payments of workers compensation benefits for any person by" "[m]aking a false or misleading *statement*" or "misrepresenting or concealing a material *fact*." (Emphasis added.) K.S.A. 44-5,120(d)(4)(A) and (B). Subsection (g)(1) further provides that "[p]ayment of a monetary penalty of not more than $2,000 *for each and every act* constituting the fraudulent or abusive act or practice, but not exceeding an aggregate penalty of $20,000 in a one-year period." (Emphasis added.) The use of the singular nouns "statement" and "fact," as well as the legislature's statement that the agency should assess a fine for "each and every act" that violates the section, support the agency's interpretation that Coonce should be assessed a fine for each false statement or misrepresentation that he made during the course of his deposition.

There certainly can be no ambiguity in the statute's usage of the term "fact." Viewing the evidence in the light most favorable to KDOL, Coonce misrepresented a number of material facts during the course of his deposition. To name a few, he claimed during his deposition that he could not bend; that he could not stand for more than 2 hours at a time; that he could not lift anything heavier than a notebook without experiencing severe pain; that he could not function well when he was on his pain medication; that he and his wife were sexually inactive; and that the most physically active thing he had done since July 2003 was attend his uncle's funeral. Several other similar misrepresentations are in the record.

The party asserting the invalidity of an agency's interpretation of a statute bears the burden of proving the invalidity. See *Blue Cross & Blue Shield of Kansas, Inc. v. Praeger*, 276 Kan. 232, 245, 75 P.3d 226 (2003). Coonce has failed to prove that KDOL's interpretation of the statute was erroneous.

Last, Coonce argues that KDOL acted arbitrarily and capriciously in assessing the $20,000 fine against him. Specifically, he urges that the agency's assessment was unreasonable in light of the fact that $20,000 is the maximum fine that a person may receive

in a 1-year period, and the agency assessed this sizeable fine against him despite the fact that he did not receive any benefits as a result of his misrepresentations.

As we have previously stated, there was more than substantial evidence to support the determination that Coonce violated K.S.A. 44-5,120(d)(4) at least 10 times. Given the agency's interpretation of the statute, which is likewise supported, it was within the hearing officer's discretion to assess up to a $2,000 fine for each of these violations. The assessment of the fine was not based "on suspicion and conjecture," but was based on the evidence in the agency record. *Praeger*, 276 Kan. at 275 (citing *In re Providence-St. Margaret Health Center*, 232 Kan. 787, 794, 659 P.2d 199 [1983]). The assessment of the $20,000 fine against Coonce was not unreasonable, arbitrary, or capricious.

Affirmed.