(171 P.3d 276)
Nos. 98,059
98,060

STATE OF KANSAS, *Appellant*, v. PETER J. MARX, *Appellee.*
STATE OF KANSAS, *Appellant*, v. DESIREE M. MARX, *Appellee.*

Opinion filed October 26, 2007.

*Vernon E. Buck*, assistant county attorney, *Marc Goodman*, county attorney, and *Paul J. Morrison*, attorney general, for appellant.

*Stephen J. Atherton*, of Atherton & Huth, of Emporia, for appellee Desiree M. Marx.

*Don C. Krueger*, of Emporia, for appellee Peter J. Marx.

Before GREENE, P.J., MALONE AND LEBEN, JJ.

MALONE, J.: The State of Kansas appeals the district court's decision granting motions to suppress evidence arising from a vehicle stop. This is a consolidated appeal involving codefendants, Peter J. Marx and Desiree M. Marx. The district court suppressed the evidence because it found the vehicle stop was unlawful. We agree with the district court's finding that the vehicle stop was not justified as a public safety or community caretaking stop. However, we disagree with the district court's finding that the sheriff's deputy lacked reasonable suspicion to stop the Marxes' vehicle for failure to maintain a single lane, in violation of K.S.A. 8-1522. The motions to suppress raised other issues which the district court did not reach that involve disputed facts and require credibility determi-

nations. Accordingly, we remand the case to district court for further proceedings.

*Factual and procedural background*

On August 22, 2006, Deputy Cory Doudican, of the Lyon County Sheriff's Department, was stopped on the side of the Kansas Turnpike at milepost 127 assisting a motorist. As the Marxes' motor home passed by Doudican's location, a hubcap flew off the motor home and landed near Doudican. After retrieving the hubcap, Doudican followed the motor home, now on I-35, and caught up with the motor home around milepost 128. Doudican ultimately stopped the motor home at milepost 129 after he saw it cross the fog line, overcorrect, and cross the centerline.

Doudican exited the patrol car and walked to the passenger side of the vehicle. Doudican observed Peter in the passenger seat and Desiree as the driver. Doudican informed the Marxes that he stopped them in order to return their hubcap and also because they failed to maintain the motor home in a single lane. Doudican subsequently testified at the suppression hearing that the primary reason for the stop was the traffic infraction.

Peter rolled the window down halfway to allow Doudican to pass the hubcap through the passenger window, and Doudican detected a "brief smell of burnt marijuana." Doudican requested driver's licenses, vehicle registration, and proof of insurance from the Marxes. Desiree accompanied Doudican back to the patrol car, where Doudican verified there were no outstanding warrants and checked the Marxes' driver's licenses and vehicle registration. Doudican confirmed that the licenses and registration were in compliance, handed the documents and a warning ticket back to Desiree, and informed her she was free to leave.

As Desiree started to open the door of the patrol car, Doudican asked if she would answer a few more questions, to which she agreed. Doudican asked if the Marxes were in possession of any illegal drugs, and Desiree denied that any drugs were in the motor home. Doudican asked for permission to search the motor home, and Desiree refused to consent to a search. Doudican then told Desiree that he intended to run his drug dog around the motor

home anyway. Upon hearing this, Desiree exited the patrol car, walked rapidly towards the motor home, entered the motor home, and shut the door. Doudican exited the patrol car and followed Desiree towards the motor home, shouting at her to stop.

Doudican looked through the side door of the motor home, as well as through the large back glass of the vehicle, and noticed the Marxes moving back and forth between the medicine cabinet and the bathroom. Doudican repeatedly ordered the Marxes to exit the motor home, but they did not initially comply. After a few minutes, Desiree exited the motor home and was placed under arrest for obstruction of official duty. Peter later exited the motor home, and he was also placed under arrest for obstruction. After being *Mirandized*, the Marxes made incriminating statements. A search of the motor home's interior and septic tank revealed drugs and paraphernalia.

The Marxes were charged in Lyon County District Court with obstructing official duty, possession of cocaine, possession of marijuana, possession of drug paraphernalia, and failure to pay drug tax. The Marxes filed motions to suppress all physical and testimonial evidence, claiming that the stop and search of the vehicle were unlawful. At the suppression hearing, the State asserted that the initial stop of the motor home was justified based on either a public safety stop because of the hubcap or based upon reasonable suspicion of a traffic infraction. The State maintained that once Doudican detected the odor of marijuana, he was authorized, at the very least, to detain the Marxes and deploy the drug dog. The State argued there was reasonable suspicion to detain the Marxes even after Doudican told Desiree she was free to go, and whether Doudican was being truthful when he told Desiree she was free to go was irrelevant. Finally, the State asserted that Desiree's return to the motor home and the Marxes' actions while inside the motor home were intervening factors that attenuated the taint of an illegal stop.

After hearing the evidence, the district court granted the motions to suppress. The district court found that Doudican was not motivated by a desire to return the hubcap and the vehicle stop was not justified as a public safety stop. The district court also

found there was no reasonable suspicion that the Marxes violated either K.S.A. 8-1522, failure to maintain a single lane, or K.S.A. 8-1548, failure to signal a turn. Because the district court found the vehicle stop was unlawful, the district court suppressed all evidence and statements without reaching other issues raised in the motions. The State filed this appeal.

### Standard of review

"In reviewing a district court's decision regarding suppression, this court reviews the factual underpinnings of the decision by a substantial competent evidence standard and the ultimate legal conclusion by a de novo standard with independent judgment. This court does not reweigh evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence. [Citation omitted.]" *State v. Ackward*, 281 Kan. 2, 8, 128 P.3d 382 (2006).

Additionally, the State bears the burden of proving the lawfulness of a search and seizure by a preponderance of the evidence. *State v. Porting*, 281 Kan. 320, 324, 130 P.3d 1173 (2006).

### Public safety stop

The State contends the district court erred in finding that the vehicle stop was not justified as a public safety stop or a community caretaking stop. The State argues that the separation of the hubcap from the motor home posed a threat to public safety, and that this danger justified Doudican's stop of the motor home.

The Kansas Supreme Court first recognized the concept of a community caretaking stop in *State v. Vistuba*, 251 Kan. 821, 840 P.2d 511 (1992). In *Vistuba*, the officer testified that she observed erratic driving and was concerned that the driver might be impaired. However, the officer specifically stated that she did not suspect any criminal activity from her observations. 251 Kan. at 822. The Supreme Court determined the stop was lawful and held: "[A] civil or criminal infraction is not always essential to justify a vehicle stop. Safety reasons alone may justify the stop, *if the safety reasons are based on specific and articulable facts*." 251 Kan. at 824.

In *State v. Gonzales*, 36 Kan. App. 2d 446, 141 P.3d 501 (2006), this court further refined the appropriate justification for a public safety stop and the limited duration and scope of such a stop. In

*Gonzales,* an officer stopped the defendant's vehicle when the officer observed a "bouncy" rear tire and an open hatch over the fuel cap. After the stop, the officer immediately asked for information about ownership of the vehicle and demanded the occupants' driver's licenses, rather than examining the problematic tire. After several minutes of questioning, the driver consented to a search of the vehicle. The court upheld the initial vehicle stop for public safety reasons, but the court also held the subsequent search of the vehicle was illegal because the duration of the stop exceeded the scope of the public safety justification. 36 Kan. App. 2d at 458.

The *Gonzales* court determined that the legality of a public safety stop can be evaluated in three steps. First, as long as there are objective, specific, and articulable facts from which a law enforcement officer would suspect that a *citizen is in need of help or is in peril*, the officer has the right to stop and investigate. Second, if the citizen is in need of aid, the officer may take appropriate action to render assistance. Third, once the officer is assured that the citizen is not in peril or is no longer in need of assistance, any actions beyond that constitute a seizure, implicating the protections provided by the Fourth Amendment to the United States Constitution. 36 Kan. App. 2d at 456.

In applying the public safety rationale, courts employ careful scrutiny "so the protections of the Fourth Amendment are not emasculated. [Citations omitted.]" *Gonzales,* 36 Kan. App. 2d at 455. Courts have held that the primary motivation of a valid public safety stop must be for community caretaking purposes. See, *e.g.,* *Corbin v. State,* 85 S.W.3d 272, 276-77 (Tex. Crim. App. 2002) ("[A] police officer may not properly invoke his community caretaking function if he is primarily motivated by a non-community caretaking purpose."); *State v. Link,* 136 Wash. App. 685, 696, 150 P.3d 610 (2007) (doctrine not applicable where primary motivation was to investigate). In *Gonzales,* this court held that a public safety stop is *not* for investigative purposes. 36 Kan. App. 2d at 457. Although a police stop for a traffic violation may be pretextual in nature, see *Whren v. United States,* 517 U.S. 806, 813, 135 L. Ed. 2d 89, 116 S. Ct. 1769 (1996), a community caretaking stop is justified only if the officer is motivated by public safety concerns.

Here, the district court determined that Doudican's stop was not primarily motivated by community caretaking concerns. The district court noted that Doudican did not immediately stop the motor home as soon as he caught up to it, but instead Doudican followed the motor home for about 1 mile before he stopped the Marxes for the traffic infraction. Also, Doudican testified he was looking for a violation to stop the motor home, and Doudican clearly testified the real reason for the stop was the perceived traffic infraction. Substantial competent evidence supports the district court's decision that Doudican's primary motivation in stopping the motor home was due to a traffic infraction, not to return the hubcap.

Doudican's motivation aside, the Marxes argue that losing a hubcap is not a sufficient reason to justify a public safety stop. We agree. Although the *Gonzales* court upheld the initial vehicle stop for public safety reasons, the court expressly rejected the open fuel hatch as justification for the stop. The court stated: "There is no dispute that the open hatch cover was not perceived as a safety problem; even [the officer] referred to it as a 'courtesy' to alert the driver to that condition. It was the bouncing tire that was the alleged safety concern." 36 Kan. App. 2d at 453.

Here, under the initial prong of the test enunciated in *Gonzales*, there were no facts that suggested to Doudican that a citizen was in need of help or was in peril at the time of the stop. Doudican already had the hubcap in his possession, and there was only a minimal risk that the motor home might lose other hubcaps on the highway in such a manner as to endanger the public. Consistent with the court's determination in *Gonzales* that the open fuel hatch did not implicate public safety, Doudican's return of the hubcap more closely resembled a "courtesy" to the Marxes rather than a concern for public safety. We conclude as a matter of law that the stop of the Marxes' motor home was not warranted under a public safety rationale.

We further note that even if the initial stop had been justified for public safety reasons, this would not have authorized Doudican to extend the scope of the stop in order to check the motor home's registration and run a warrants check on the Marxes. As the court

determined in *Gonzales*, where the driver was stopped for having a bouncy tire, the justification for the stop was limited to an examination of the tire to determine if it was safe to continue driving. 36 Kan. App. 2d at 457. Here, even if Doudican was justified in stopping the motor home because of the hubcap, the scope of the stop would have been limited to returning the hubcap and checking the other hubcaps on the motor home to see if they were secure.

For these reasons, we affirm the district court's finding that Doudican's stop of the Marxes' motor home was not justified as a public safety stop.

### *Failure to maintain a single lane*

The State claims that if the stop of the Marxes' motor home was not lawful under a public safety rationale, the stop was nevertheless authorized as Doudican had reasonable suspicion that Desiree had violated K.S.A. 8-1522 by failing to maintain the motor home within a single lane. The undisputed testimony by Doudican was that the Marxes' motor home crossed the fog line once, overcorrected, and crossed the centerline in its lane of traffic. Doudican immediately stopped the motor home when he saw this maneuver, and he later testified this was the primary reason for the stop.

Kansas law provides that an "officer may stop any person in a public place whom such officer reasonably suspects is committing, has committed or is about to commit a crime." K.S.A. 22-2402(1). Doudican stopped the Marxes for violating K.S.A. 8-1522, which provides, in relevant part:

"Whenever any roadway has been divided into two (2) or more clearly marked lanes for traffic, the following rules in addition to all others consistent herewith shall apply.

"(a) A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety."

The interpretation of a statute is a question of law over which an appellate court has unlimited review. An appellate court is not bound by the district court's interpretation of a statute. *State v. Bryan*, 281 Kan. 157, 159, 130 P.3d 85 (2006).

"The fundamental rule of statutory construction is to ascertain the legislature's intent. The legislature is presumed to have expressed its intent through the language of the statutory scheme. Ordinary words are given their ordinary meanings. A statute should not be read to add language that is not found in it or to exclude language that is found in it. When a statute is plain and unambiguous, the court must give effect to the legislature's intent as expressed rather than determining what the law should or should not be. [Citation omitted.]" *Bryan*, 281 Kan. at 159.

The district court relied on *State v. Ross*, 37 Kan. App. 2d 126, 149 P.3d 876 (2007), *rev. denied* 284 Kan. 950 (2007), to determine that Doudican had no reasonable suspicion that K.S.A. 8-1522 was violated by the Marxes' conduct. In *Ross*, the defendant's vehicle was stopped after the officer observed the defendant cross the fog line only once. Ross was arrested for driving with an expired license. Illegal drugs and paraphernalia were found, for which Ross was charged. 37 Kan. App. 2d at 127-28.

On appeal, this court reversed the district court's failure to grant the defendant's motion to suppress, holding that the officer's observation that Ross crossed the fog line only once did not, without more, provide reasonable suspicion that K.S.A. 8-1522 had been violated. 37 Kan. App. 2d at 131. The court reasoned that the "essential gravamen" of K.S.A. 8-1522 requires a showing that a vehicle's movement from a lane of traffic cannot be made with safety. 37 Kan. App. 2d at 130. The court concluded that in order for the State to establish reasonable suspicion that K.S.A. 8-1522 has been violated, "the totality of the circumstances must make it appear to the officer that not only did the defendant's vehicle move from its lane of travel, but it left its lane *when it was not safe to do so*." (Emphasis added.) 37 Kan. App. 2d at 130.

The *Ross* decision was heavily criticized in *United States v. Jones*, 501 F. Supp. 2d 1284 (D. Kan. 2007). In *Jones*, the officer observed a vehicle driven by one of the defendants weave out of its lane, crossing the fog line by a tire width. Believing that K.S.A. 8-1522 had been violated, the officer stopped the vehicle, and a subsequent search revealed the defendants in possession of cocaine. The defendants argued that, under *Ross*, the evidence should be suppressed. 501 F. Supp. 2d at 1285.

The *Jones* court denied the defendants' motion to suppress. According to *Jones*, the *Ross* opinion is "ambiguous on whether an officer has reasonable suspicion of a K.S.A. 8-1522 violation only if the lane movement was actually unsafe or whether it is enough that the officer reasonably suspects the driver failed to determine first the safety of the lane movement." 501 F. Supp. 2d at 1292. The *Jones* court noted that K.S.A. 8-1522 was patterned after § 11-309 (2000) of the Uniform Vehicle Code. 501 F. Supp. 2d at 1292. According to *Jones*, the *Ross* decision is in "conflict with the well-reasoned precedent of other jurisdictions and, in particular, the well-established line of Tenth Circuit precedent interpreting [K.S.A. 8-]1522(a)." 501 F. Supp. 2d at 1298.

The Tenth Circuit has consistently held that a vehicle drifting out of a lane, even one time, can provide reasonable suspicion of a violation of K.S.A. 8-1522 when, under the circumstances, the driver should reasonably be expected to maintain a straight course. See *United States v. Alvarado*, 430 F.3d 1305, 1309 (10th Cir. 2005) (relatively minor infraction of crossing a fog line can create reasonable suspicion of violating Utah's version of K.S.A. 8-1522); *United States v. Ozbirn*, 189 F.3d 1194, 1199 (10th Cir. 1999) (reasonable suspicion of a K.S.A. 8-1522 violation was found where defendant's motor home crossed the fog line twice within a quarter mile).

The *Jones* court also discussed the "reasonable suspicion" standard sufficient to stop a driver for violating K.S.A. 8-1522, in relation to considering a motion to suppress evidence seized during the stop. According to *Jones*, the court's role is not to decide whether the facts are sufficient to sustain a conviction under K.S.A. 8-1522, but whether they are adequate to form an objectively reasonable suspicion that the defendant's vehicle was being operated in violation of the statute. If an officer reasonably believes in good faith that a traffic violation has occurred, the stop is valid even if it ultimately turns out that the driver is not guilty of the traffic violation. *Jones*, 501 F. Supp. 2d at 1298 n.15.

Returning to our facts, the evidence is undisputed that Doudican observed the Marxes' motor home cross the fog line, overcorrect, and cross the centerline. This is an inherently unsafe maneuver.

There was no evidence presented by either party of any obstruction in the roadway which would have reasonably caused the motor home to swerve. Doudican immediately activated his emergency lights and conducted a traffic stop. He informed Desiree that one reason for the stop was her failure to maintain a single lane. Doudican later testified that this was the primary reason for the stop.

Under these facts, we conclude the district court erred as a matter of law in finding that Doudican lacked reasonable suspicion to stop the Marxes' motor home for failure to maintain a single lane, in violation of K.S.A. 8-1522. In reaching this conclusion, we decline to follow the *Ross* court's interpretation of K.S.A. 8-1522. We interpret K.S.A. 8-1522 to mean that a vehicle shall be driven as nearly as practicable entirely within a single lane of traffic. The "nearly as practicable" language allows a driver to momentarily move outside a lane of traffic due to special circumstances such as weather conditions or an obstacle in the road. Otherwise, the driver must stay in one lane. The statute further provides that if a driver intentionally decides to move his or her vehicle from its lane of traffic, the driver must first ascertain that such movement can be made with safety.

The Marxes argue that the State failed to produce evidence to establish whether there were special circumstances which may have caused Desiree to leave her lane of traffic, such as weather conditions or an obstacle in the road. We recognize that the State bears the overall burden of proving the lawfulness of a search and seizure by a preponderance of the evidence. *Porting*, 281 Kan. at 324. However, if there was a special circumstance such as an obstacle in the road which caused Desiree to swerve the motor home, it would seem that this is evidence only she could provide. The State is not required to prove a negative. Although the prosecutor could have asked Doudican if he observed anything that might have caused the motor home to swerve, the prosecutor's failure to ask this question was not fatal. This was a *suppression hearing* where the State was required to show reasonable suspicion for a stop, not a trial where the State was attempting to convict Desiree of violating K.S.A. 8-1522.

Doudican's observation that the Marxes' motor home crossed the fog line, overcorrected, and crossed the centerline established reasonable suspicion of a violation of K.S.A. 8-1522 sufficient to justify the stop. Moreover, even if Desiree subsequently provided a legitimate defense for moving from her lane of traffic, such as to avoid an obstacle in the road, this would not invalidate the stop as long as Doudican reasonably believed in good faith that a traffic violation had occurred.

The district court also determined that Doudican did not have reasonable suspicion to stop the Marxes' motor home for a violation of K.S.A. 8-1548, failure to signal a turn. Because we conclude the district court erred in interpreting K.S.A. 8-1522, we do not need to reach the district court's decision concerning the alleged violation of K.S.A. 8-1548.

In summary, we agree with the district court's finding that the vehicle stop was not justified as a public safety or community care-taking stop. However, we conclude the district court erred in finding that Doudican lacked reasonable suspicion to stop the Marxes' motor home for failure to maintain a single lane in violation of K.S.A. 8-1522. Thus, the vehicle stop was lawful. However, this does not necessarily mean that the Marxes' motions to suppress should be denied. There were several issues raised in the motions which the district court never reached. These issues included whether Doudican's investigation exceeded the scope of the initial traffic stop, whether the extended detention was justified based upon the odor of marijuana, whether Desiree's consent to answer Doudican's questions after she was told she was free to go was voluntary under the totality of the circumstances, and whether the Marxes' conduct in allegedly obstructing official duty attenuated the taint of any unlawful police conduct. These issues involve disputed facts which require credibility determinations only the district court can make. Accordingly, we remand the case to district court for further proceedings consistent with this opinion.

Affirmed in part, reversed in part, and remanded.