Nos. 98,059
98,060

STATE OF KANSAS, *Appellant*, v. PETER J. MARX, *Appellee*.

STATE OF KANSAS, *Appellant*, v. DESIREE M. MARX, *Appellee*.

(215 P.3d 601)

Opinion filed September 18, 2009.

*Vernon E. Buck*, first assistant county attorney, argued the cause, and *Marc Goodman*, county attorney, and *Paul J. Morrison*, attorney general, were with him on the brief for the appellant.

*Stephen J. Atherton*, of Atherton & Huth, of Emporia, argued the cause, and *Don C. Krueger*, of Emporia, was with him on the brief for the appellees.

The opinion of the court was delivered by

JOHNSON, J.: Peter and Desiree Marx seek review of the Court of Appeals' reversal of the district court's suppression of evidence obtained during a traffic stop detention. The reversal was based on the Court of Appeals' determination that the initial traffic stop was lawful because the detaining officer had a reasonable suspicion that the vehicle driver had violated K.S.A. 8-1522. The State cross-petitions for review of the Court of Appeals' holding that the district court correctly determined that the initial detention was not justified as a public safety or community caretaking stop. We affirm the Court of Appeals on the State's cross-petition, but reverse its holding on the officer's reasonable suspicion of criminal activity.

*FACTUAL OVERVIEW*

The parties essentially agree with the factual recitation in the Court of Appeals opinion. See *State v. Marx*, 38 Kan. App. 2d 598, 600-02, 171 P.3d 276 (2007). The State does take exception to one statement about the officer's conduct during the detention, but

that factual discrepancy has no bearing on the question presented in this appeal. For our purposes, a summarized version of only the relevant facts will suffice.

Lyon County Sheriff's Deputy Cory Doudican was providing roadside assistance to a motorist at milepost 127 of the Kansas Turnpike when the Marxes' motor home lost a hubcap as it passed by Doudican's location. Doudican retrieved the hubcap and headed after the motor home, catching up with the vehicle approximately a mile down the road. The deputy continued to follow the motor home for approximately 1/2 to 1 mile, until he "noticed that the motorhome crossed the fog line, which is a solid white line, overcorrected and crossed the center line." That observation prompted the deputy to activate the emergency lights and conduct a traffic stop. On cross-examination, the deputy clarified that, by "centerline," he was referring to the "dotted line," which presumably is the lane marker between the two northbound lanes of I-35. The deputy also acknowledged that the motor home was displaying California license plates and heading north on I-35.

The deputy approached the vehicle's passenger side, handed the hubcap to Peter through a half-open window, and detected a "brief smell of burnt marijuana." The deputy obtained the Marxes' driver's licenses, vehicle registration, and proof of insurance, and had Desiree, the vehicle's driver, accompany him to the patrol car. After issuing a warning ticket, returning the couple's documents, and telling Desiree that she was free to leave, subsequent events led to a search of the motor home and the discovery of drugs and paraphernalia. The Marxes also made post-*Miranda* incriminating statements.

The Marxes were charged with obstructing official duty, possession of cocaine, possession of marijuana, possession of drug paraphernalia, and failure to pay drug tax. They filed a motion to suppress all physical and testimonial evidence, challenging both the initial vehicle stop and the extended detention. In granting the motion, the district court first found that the deputy was not motivated by a desire to return the hubcap and the initial detention was not justified as a public safety stop. Next, the district court found that the deputy did not have reasonable suspicion that De-

siree had violated K.S.A. 8-1522, failure to maintain a single lane, and that the deputy had not testified that he stopped the vehicle for a violation of K.S.A. 8-1548, failure to signal a turn. Because the district court found the initial vehicle stop was unlawful, it did not reach the other issues concerning the deputy's conduct during the detention.

The State appealed, claiming the initial vehicle stop was lawful for two reasons: (1) It was justified as a public safety or community caretaking stop; or (2) the deputy had reasonable suspicion that Desiree had violated K.S.A. 8-1522(a) by failing to maintain the motor home within a single lane. As noted, the Court of Appeals rejected the public safety argument but agreed that the stop was lawfully supported by reasonable suspicion of criminal activity. In remanding to the district court, the Court of Appeals directed the district court to address the unanswered issues raised in the suppression motion, such as whether the deputy's investigation exceeded the scope of the initial stop. 38 Kan. App. 2d at 609. We granted both the Marxes' petition for review and the State's cross-petition for review.

*STANDARD OF REVIEW*

The Court of Appeals cited to the oft-repeated standard of review for evidence suppression issues on appeal:

" 'In reviewing a district court's decision regarding suppression, [an appellate] court reviews the factual underpinnings of the decision by a substantial competent evidence standard and the ultimate legal conclusion by a de novo standard with independent judgment. This court does not reweigh evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence. [Citation omitted.]' *State v. Ackward*, 281 Kan. 2, 8, 128 P.3d 382 (2006)." 38 Kan. App. 2d at 602.

Additionally, this case requires us to interpret the provisions of K.S.A. 8-1522(a). To that extent, our review is also unlimited and likewise unfettered by the trial court's legal rulings. See *State v. Bryan*, 281 Kan. 157, 159, 130 P.3d 85 (2006).

In stating the standard of review, the Court of Appeals also noted that "the State bears the burden of proving the lawfulness of a search and seizure by a preponderance of the evidence. *State v. Porting*, 281 Kan. 320, 324, 130 P.3d 1173 (2006)." *Marx*, 38 Kan.

App. 2d at 602. In that regard, the Marxes cite to *Dalmasso v. Dalmasso*, 269 Kan. 752, Syl. ¶ 6, 9 P.3d 551 (2000), for the proposition that any ruling which is merely adverse to the party with the burden of proof is a "negative finding," and negative findings will not be disturbed on appeal absent proof of an arbitrary disregard of undisputed evidence or some extrinsic consideration such as bias, passion, or prejudice. However, such a deferential standard should not be, and in practice has not been, actually applied to undermine the de novo, independent review of legal questions with which appellate courts are properly imbued.

Nevertheless, as the Marxes point out, the district court in this case made a number of findings describing facts for which the State had failed to present evidence. Such findings are truly negative findings, and we will review them as such in lieu of applying the substantial competent evidence standard.

*UNDERLYING PRINCIPLES*

Before directly addressing the issues raised in this appeal, we pause to briefly review the underlying principles. Both the Fourth Amendment to the United States Constitution and §15 of the Kansas Constitution Bill of Rights prohibit unreasonable governmental searches and seizures. The inquiry into the reasonableness of searches and seizures balances the State's interests against an individual's right to be secure from unwarranted governmental intrusion. *Terry v. Ohio*, 392 U.S. 1, 20-21, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968).

A law enforcement officer who stops a vehicle on a public roadway has effected a seizure. See *State v. McKeown*, 249 Kan. 506, 510, 819 P.2d 644 (1991) (vehicle stop on public roadway always a seizure). In this state, we have recognized two circumstances where the State's interests outweigh the intrusion on individual rights occasioned by a vehicle seizure.

The first circumstance, based on *Terry v. Ohio* and codified in K.S.A. 22-2402(1), arises where the officer knows of specific and articulable facts that create a reasonable suspicion that a crime has been, is being, or is about to be committed. See *State v. Anderson*, 281 Kan. 896, 901, 136 P.3d 406 (2006). Frequently, the State

establishes this circumstance through the officer's pre-stop observation of a traffic infraction. " 'A traffic violation provides an objectively valid reason to effectuate a traffic stop, even if the stop is pretextual.' " *State v. Moore*, 283 Kan. 344, 350, 154 P.3d 1 (2007) (quoting *State v. Anderson*, 281 Kan. 896, 901, 136 P.3d 406 [2006]).

The second circumstance, commonly referred to as the community caretaking stop or public safety stop, was first recognized by this court in *State v. Vistuba*, 251 Kan. 821, 840 P.2d 511 (1992), *disapproved in part on other grounds by State v. Field*, 252 Kan. 657, 847 P.2d 1280 (1993). *Vistuba* divined that "a civil or criminal infraction is not always essential to justify a vehicle stop. Safety reasons alone may justify the stop, *if the safety reasons are based on specific and articulable facts.*" 251 Kan. at 824. Subsequently, the Court of Appeals opined that to justify a public safety stop, the officer must have objective, specific, and articulable facts to suspect that a citizen is in need of help or is in peril. *State v. Gonzales*, 36 Kan. App. 2d 446, 456, 141 P.3d 501 (2006).

This appeal requires our consideration of both circumstances. We take the liberty of commencing with the State's cross-petition, which challenges the Court of Appeals' rejection of its proffered public safety stop rationale.

*PUBLIC SAFETY/COMMUNITY CARETAKING STOP*

In its cross-petition, the State argues that the community caretaking function of a law enforcement officer is broad enough to encompass mechanical problems with vehicles that implicate public safety. Specifically, in this instance, the State argues that Deputy Doudican was justified in stopping the motor home to check for other loose parts that might dislodge and fly through the air.

The Court of Appeals applied its prior holding in *Gonzales* to reject the State's argument regarding the scope of public danger posed by the lost hubcap. In *Gonzales*, the law enforcement officer had observed a "bouncing" rear tire and an open hatch cover over the fuel cap on the vehicle that was detained. 36 Kan. App. 2d at 448. The Court of Appeals reiterated *Gonzales'* holding that to justify a public safety vehicle stop, there must be objective, specific,

and articulable facts which would lead a law enforcement officer to reasonably suspect that a citizen is in need of help or is in peril. *Marx,* 38 Kan. App. 2d at 603. The *Marx* panel then noted that *Gonzales* had found that the bouncy tire fit the criteria for public safety, justifying the vehicle stop, but that the open fuel hatch did not. The open fuel hatch merely presented a matter of public "courtesy." The Court of Appeals opined that the Marxes' lost hubcap was more akin to Gonzales' open fuel hatch, making the stop a courtesy endeavor rather than a bona fide public safety stop. 38 Kan. App. 2d at 604.

More importantly, the Court of Appeals' assessment of the level of public danger posed by the Marxes' mechanical problem was a secondary consideration. The opinion's principal holding is that "the primary motivation of a valid public safety stop must be for community caretaking purposes." 38 Kan. App. 2d at 603. Although the holding in *Whren v. United States,* 517 U.S. 806, 813, 135 L. Ed. 2d 89, 116 S. Ct. 1769 (1996), requires us to ignore a law enforcement officer's subjective motivation for stopping a vehicle for a traffic violation, permitting the public safety rationale to serve as a pretext for an investigative detention runs the risk of emasculating our Fourth Amendment protections. See *Marx,* 38 Kan. App. 2d at 603.

As the Court of Appeals noted, the district court specifically found that Deputy Doudican's stop was not primarily motivated by community caretaking concerns. That finding is supported by substantial competent evidence, not the least of which was the deputy's admission that the real reason for the stop was the perceived traffic infraction. Moreover, a community caretaking motivation is belied by the deputy's actions in following the motor home for approximately a mile in the hope of observing a traffic violation rather than immediately addressing the alleged endangerment to the public.

We are persuaded by the sound reasoning of the Court of Appeals' decision. The State failed to carry its burden of justifying the initial detention of the Marxes' motor home as a public safety stop for community caretaking purposes. The Court of Appeals holding on this issue, affirming the district court's ruling, is affirmed.

REASONABLE SUSPICION OF TRAFFIC INFRACTION

As this case is presented to us, the question of whether the initial stop of the motor home was a lawful investigatory detention based on reasonable suspicion of criminal activity turns on Deputy Doudican's allegations that he observed a violation of K.S.A. 8-1522(a). That statute provides:

"Whenever any roadway has been divided into two (2) or more clearly marked lanes for traffic, the following rules in addition to all others consistent herewith shall apply.

"(a) A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety." K.S.A. 8-1522.

The district court had to determine whether the deputy's testimony—that he observed the motor home cross the fog line, overcorrect, and cross the centerline—was sufficient to meet the State's burden of proving that the deputy had reasonable suspicion that the motor home driver was violating K.S.A. 8-1522(a), which is designated as a traffic infraction. See K.S.A. 21-3105(2) (traffic infraction is violation of any statutory provision listed in K.S.A. 8-2118); K.S.A. 2008 Supp. 8-2118(c) (listing 8-1522 in uniform fine schedule). In analyzing that question, the district court relied on the prior Court of Appeals decision in *State v. Ross*, 37 Kan. App. 2d 126, 149 P.3d 876, *rev. denied* 284 Kan. 950 (2007).

In *Ross*, an officer followed the defendant's vehicle for approximately 2 miles before observing the automobile cross over the fog line once. The officer stopped the vehicle based on a violation of K.S.A. 8-1522(a). After discovering the defendant did not have a valid driver's license, the officer arrested the defendant and subsequently found drugs and drug paraphernalia on his person. The district court denied Ross' challenge to the legality of the initial stop.

On appeal, Ross argued that the statute's requirement of maintaining a single lane is specifically qualified by the phrase, "as nearly as practicable," so that crossing the fog line is not necessarily a violation of K.S.A. 8-1522(a). The Court of Appeals agreed, finding that " '[a]s nearly as practicable' connotes something less than the absolute." 37 Kan. App. 2d at 129. The panel noted that au-

tomobiles, unlike railway locomotives, do not run on fixed rails. 37 Kan. App. 2d at 129.

The opinion then discussed instances where a driver is permitted to exercise discretion in deciding whether to change lanes, such as to avoid a hazard in the roadway or to pass slower moving vehicles. Accordingly, *Ross* opined that the essential gravamen of K.S.A. 8-1522(a) is that "[w]e may move from our lane of travel only after first determining it is safe to do so." 37 Kan. App. 2d at 130. Applying its interpretation of K.S.A. 8-1522(a), *Ross* concluded:

"In the present case, Ross was proceeding northbound on I-135 near Newton. We presume that the right shoulder of the highway was paved, as is the normal situation, since there is no evidence to the contrary. There was no testimony that there was any obstacle or barrier on the shoulder that presented an immediate danger. There was no testimony that sand, gravel, or debris on the shoulder presented a hazard to a motorist who directed his or her vehicle onto the shoulder. There was no testimony that [the police officer] was concerned that the driver might have been falling asleep or was intoxicated. Ross' vehicle was not weaving back and forth on the roadway. He was not using the paved shoulder as a regular lane of travel. He crossed the fog line only briefly, for only a short distance, and only once. In short, there was no reasonable suspicion that Ross was engaged in the conduct that is at the heart of the statute: moving a vehicle from its lane of travel without first ascertaining that it could be done safely. Absent any such concern on [the officer's] part, there was no reasonable suspicion to warrant stopping Ross and, therefore, insufficient evidence to support his convictions. The district court erred in not suppressing the evidence obtained by this unsupported governmental intrusion." 37 Kan. App. 2d at 131.

Consistent with *Ross*, the district court in this case included a number of findings in its suppression hearing journal entry detailing what the State had failed to prove, including:

"5. There was no evidence presented how far across the centerline the defendants' vehicle traveled.

"6. There was no evidence presented to the court, that in the totality of the circumstances it was not safe for the defendants' vehicle to move from its lane of travel.

. . . .

"10. There was not testimony presented that Doudican was concerned that the driver of defendants' vehicle was falling asleep.

"11. No evidence was presented that defendants' vehicle was weaving back and forth on the roadway.

"12. There was no testimony presented that there was sand, gravel or other debris on the shoulder of the roadway which would present a hazard to a motorist who directed his or her vehicle onto the shoulder.

"13. There was no evidence presented that there was any obstacle or barrier on the shoulder of the roadway that presented an immediate danger.

"14. There was no testimony concerning traffic conditions on the roadway at the time the officer stopped defendants' vehicle.

"15. Deputy Doudican had no reasonable suspicion of a violation of K.S.A. 8-1522."

The Court of Appeals in this case did not focus on the district court's findings, presumably because it disapproved of the *Ross* opinion upon which those findings were based. In that vein, *Marx* discussed *United States v. Jones*, 501 F. Supp. 2d 1284 (D. Kan. 2007), which the panel characterized as having "heavily criticized" *Ross*' interpretation of K.S.A. 8-1522. 38 Kan. App. 2d at 606. The Court of Appeals recited:

"According to *Jones*, the *Ross* opinion is 'ambiguous on whether an officer has reasonable suspicion of a K.S.A. 8-1522 violation only if the lane movement was actually unsafe or whether it is enough that the officer reasonably suspects the driver failed to determine first the safety of the lane movement.' 501 F. Supp. 2d at 1292. The *Jones* court noted that K.S.A. 8-1522 was patterned after § 11-309 (2000) of the Uniform Vehicle Code. 501 F. Supp. 2d at 1292. According to *Jones*, the *Ross* decision is in 'conflict with the well-reasoned precedent of other jurisdictions and, in particular, the well-established line of Tenth Circuit precedent interpreting [K.S.A. 8-] 1522(a).' 501 F. Supp. 2d at 1298." 38 Kan. App. 2d at 607.

The *Marx* panel opined that "[t]he Tenth Circuit has consistently held that a vehicle drifting out of a lane, even one time, can provide reasonable suspicion of a violation of K.S.A. 8-1522 when, under the circumstances, the driver should reasonably be expected to maintain a straight course." 38 Kan. App. 2d at 607. Further, the panel related *Jones*' discussion of the reasonable suspicion standard, which does not require that the facts be sufficient to sustain a conviction under K.S.A. 8-1522. Rather, the facts need only be adequate to allow the formation of an objectively reasonable suspicion of a statutory violation. Moreover, *Jones* noted that where an officer reasonably believed in good faith that a traffic violation had occurred, the stop would remain valid even if the driver were

to be subsequently found not guilty of the traffic violation. 38 Kan. App. 2d at 607.

Returning to the facts of the instant case, the Court of Appeals noted that the evidence was undisputed that the deputy had observed the Marxes' motor home cross the fog line, overcorrect, and cross the centerline. The panel declared that to be "an inherently unsafe maneuver," and it held that the district court had "erred as a matter of law" when it found the deputy lacked reasonable suspicion of a K.S.A. 8-1522 violation. 38 Kan. App. 2d at 607-08. In reaching that conclusion, the *Marx* panel specifically rejected *Ross'* interpretation of K.S.A. 8-1522 in favor of its own explanation of what the statutory language means:

"We interpret K.S.A. 8-1522 to mean that a vehicle shall be driven as nearly as practicable entirely within a single lane of traffic. The 'nearly as practicable' language allows a driver to momentarily move outside a lane of traffic due to special circumstances such as weather conditions or an obstacle in the road. Otherwise, the driver must stay in one lane. The statute further provides that if a driver intentionally decides to move his or her vehicle from its lane of traffic, the driver must first ascertain that such movement can be made with safety." 38 Kan. App. 2d at 608.

Our first task is to resolve the conflict between *Ross* and *Marx* as to the conduct proscribed by K.S.A. 8-1522(a), *i.e.*, to determine the elements of the offense. We begin, as we must, by returning to the statutory language. See *Winnebago Tribe of Nebraska v. Kline*, 283 Kan. 64, 77, 150 P.3d 892 (2007) (fundamental rule of statutory construction requires giving effect to legislature's language rather than determining what the law should or should not be).

The opening paragraph of K.S.A. 8-1522 establishes a condition precedent to the applicability of the rules which follow. The driver must be traveling on a roadway which has been divided into two or more clearly marked lanes for traffic. There is no dispute that the lane from which the Marxes' vehicle allegedly strayed was clearly marked on both sides.

The first listed rule then states: "A vehicle shall be driven as nearly as practicable entirely within a single lane *and* shall not be moved from such lane until the driver has first ascertained that

such movement can be made with safety." (Emphasis added.) K.S.A. 8-1522(a). The statute directs drivers to perform a positive act (drive entirely within one's lane) and to refrain from doing a prohibited act (moving from one's travel lane without first ascertaining it is safe to do so). Standing alone, each directive is seemingly straightforward, and we do not discern that the Court of Appeals' conflict in the *Ross* and *Marx* opinions is based upon differing interpretations of the individual directives. Where those opinions appear to depart is in their respective characterization of the relationship between the directives, *i.e.*, whether they are alternative means of violating K.S.A. 8-1522(a) or are both necessary elements of but one prohibited act.

*Jones* suggested that *Ross* had ignored the positive directive of K.S.A. 8-1522(a) (drive entirely within one's lane) by collapsing it into the negative directive (do not move without ascertaining it is safe) to glean only a single duty emanating from K.S.A. 8-1522(a), which was stated as: " 'We may move from our lane of travel only after first determining it is safe to do so.' [Citation omitted.]" *Jones*, 501 F. Supp. 2d at 1291 (quoting *Ross*, 37 Kan. App. 2d at 130). However, we view the effect of the *Ross* holding as treating the two directives as elements of a single offense, so that to obtain a conviction under K.S.A. 8-1522(a), the State must prove both that the driver failed to stay within the lane markers and that the movement outside the lane was made without first ascertaining that it was safe to move.

Support for *Ross'* position can be found in the plain language of K.S.A. 8-1522(a). The word "and" sits between the two directives; "and" is ordinarily used in a statute as a conjunctive. 82 C.J.S., Statutes § 331. To paraphrase the legislature, a person is to drive within a single lane *and* is not to move without ascertaining it is safe to do so. Arguably, then, the safety factor is conjoined with, and always applicable to, the duty to maintain a single lane.

Further, *Ross* could have found support in the decisions of other jurisdictions. As *Jones* acknowledged:

"A review of other jurisdictions reveals more diversity in interpretation than one would expect for a uniform vehicle code provision. A number of jurisdictions read together the duties of maintaining a single lane and of ascertaining the safety

of changing lanes before doing so and then recognize a violation only if the lane movement was made before the safety of the movement was ascertained. *See, e.g., Crooks v. State*, 710 So. 2d 1041, 1043 (Fla. App. 2 Dist. 1998); *State v. Tague*, 676 N.W.2d 197, 203 (Iowa 2004); *Rowe v. State*, 363 Md. 424, 769 A.2d 879, 885 (2001); *State v. McBroom*, 179 Or. App. 120, 39 P.3d 226, 229 (Or. App. 2002); *Hernandez v. State*, 983 S.W.2d 867, 871 (Tex. App. 1998). Some of those decisions may be premised, in part, on reading the statute as prohibiting movement only between marked traffic lanes and not prohibiting movement across the fog line onto the shoulder of the road. *State v. Phillips*, 2006 WL 3477003 at 9 (Ohio App. 3 Dist. 2006); *see State v. Lafferty*, 291 Mont. 157, 162, 967 P.2d 363, 366 (Mont. 1998) ('In our view, however, the statute relates to moving from a marked traffic lane to another marked traffic lane.'); *see, e.g., State v. Tague*, 676 N.W.2d at 203 (citing *Lafferty*); *Rowe v. State*, 769 A.2d at 886 (citing and quoting *Lafferty*). In some of those decisions, one can even find language suggesting that the statute is violated only by an unsafe lane change. [Citations omitted.]" *Jones*, 501 F. Supp. 2d at 1296-97.

Some of these cases rely on a belief that the principal purpose of the statute is to promote safety on laned highways. See, *e.g., Crooks v. State*, 710 So. 2d 1041, 1043 (La. App. 1997) ("a violation does not occur in isolation, but requires evidence that the driver's conduct created a reasonable safety concern"); *Rowe v. State*, 363 Md. 424, 434, 769 A.2d 879 (2001) ("more than the integrity of the lane markings, the purpose of the statute is to promote safety on laned roadways"); and *Hernandez v. State*, 983 S.W.2d 867, 871 (Tex. App. 1998) ("the history of the relevant statutory provision seems to indicate that, with respect to a vehicle's straying over a lane marker, a traffic violation occurs only when the vehicle's movement is in some way unsafe").

*Marx*, on the other hand, took a different tack, interpreting the statute as creating two separate duties: (1) A driver must stay within the lane markers except for momentary breaches caused by special circumstances; and (2) a driver who intentionally decides to move the vehicle from the lane of travel must first ascertain that such movement may be made with safety. The opinion suggested that proof of a breach of the duty to stay within one's lane is sufficient, without more, to constitute a violation of K.S.A. 8-1522(a). In effect then, *Marx* construed the statute as creating alternative means for committing the traffic infraction by either: (1) violating the integ-

rity of the lane markers; *or* (2) by effecting a lane change without ascertaining it was safe to do so.

As with the discussion of *Ross*, one can find decisions from other jurisdictions to bolster the *Marx* interpretation. As *Jones* noted, some jurisdictions and courts "read the uniform provision [8-1522] as consisting of two separate requirements and as having been violated if either requirement is not met." 501 F. Supp. 2d at 1297 (citing *People v. Butler*, 81 Cal. App. 3d Supp. 6, 8, 146 Cal. Rptr. 856, 857 [1978]; *People v. Smith*, 172 Ill. 2d 289, 216 Ill. Dec. 658, 665 N.E.2d 1215, 1218-19 [1996] ["plain language of the statute establishes two separate requirements for lane usage"]; *State v. Hodge*, 147 Ohio App. 3d 550, 771 N.E.2d 331, 338-39 [2002]). Some of the cases imply that the provision was not intended to allow "lane-straddling," even when it might be safe to do so, or that the safety consideration of the second directive was intended to apply solely to lane changes, not to lane-straddling. See *Butler*, 81 Cal. App. 3d Supp. at 8 (to allow motorists to ignore lane markings so long as they did not make an unsafe movement would have clearly deleterious effect on ordinary flow of traffic); *McBroom*, 179 Or. App. at 126 (driver not excused from staying within lane unless moving from one lane to another after first making certain it is safe).

K.S.A. 8-1522 was patterned after § 11-309 of the Uniform Vehicle Code, and K.S.A. 8-2203 directs that the uniform act "shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of those states which enact it." However, as demonstrated by the above citations, no clearly uniform interpretation of this provision has emerged from our sister states that would constrain, or even guide, our interpretation and construction of K.S.A. 8-1522. Moreover, although great respect is accorded the decisions of the federal jurists in the Tenth Circuit, the ultimate responsibility for interpreting the laws of the state of Kansas falls squarely on our shoulders. Accordingly, we humbly strike out on our own to intuit the most logical meaning to ascribe to this legislative language.

First, we must squarely address the drafters' use of the conjunctive "and" between the two directives, as did the California

appellate court in *Butler*. That decision resolved the dilemma by declaring that "to carry out the legislative intention 'and' can be interpreted as meaning 'or.' " 81 Cal. App. 3d at 8. Such a "black" means "white" declaration is difficult to reconcile with our statutory construction directive that "[o]rdinary words are given their ordinary meaning." See *Winnebago Tribe of Nebraska*, 283 Kan. at 77.

However, this court has utilized that same convenient rule of substitution where it discerned that the legislature was simply imprecise in its word choice. See *State ex rel. Stephan v. Martin*, 230 Kan. 747, 751-53, 641 P.2d 1011 (1982) (noting that "or" and "and" are frequently misused; the court will construe the language to reflect the true meaning and intent of a statute); *Starr v. Flynn*, 62 Kan. 845, 847-49, 62 P. 659 (1900) (quoting Sutherland on Statutory Construction § 252 and finding it is permissible to substitute "or" for "and" and vice versa in order to give conflicting statutory sections force and effect). Further support can be found in legal treatises.

"[C]onjunctive words used in a statute may be construed as disjunctive. The courts will not resort to such a construction, however, except for strong reasons, and only if the context favors that interpretation.

". . . The words 'or' and 'and' may be construed as interchangeable when, and if, it is necessary to effectuate the obvious intention of the legislature, as where the failure to adopt such a construction would render the meaning of the statute ambiguous or result in absurdities." 82 C.J.S., Statutes § 331.

We perceive that this is one of those rare occasions when the context of the entire statute counsels against placing an inordinate emphasis on the chosen connecting word. See *McIntosh v. Sedgwick County*, 282 Kan. 636, 642, 147 P.3d 869 (2006) (courts not permitted to focus on isolated part of act but must consider and construe together all parts thereof *in pari materia*). The rules set forth in the statute address two different operational aspects of traveling on a laned roadway: driving down the road in a selected lane of travel and changing the lane of travel. When a driver is engaged in one operation, he or she is not engaged in the other. Each directive is preceded by its own commanding word, "shall."

Conjoining both rules as elements of one offense is, at best, highly suspect.

The first directive mandates that the vehicle must be driven as nearly as practicable entirely within a single lane (single lane rule). This is a continuous rule; it applies to the entire trip on a laned roadway and ceases to apply only when the vehicle exits the roadway. However, the statute provides for a temporary suspension of the single lane rule in two instances: when it is impracticable to stay within the lane markers and when the driver is moving from the lane of travel. Obviously, the single lane rule must yield to a lane change or that maneuver could not be accomplished. Nevertheless, once the lane change is effected and the vehicle is traveling in the new lane, the single lane rule suspension must end. It would render the single lane rule a nullity to permit a driver to straddle a lane marker for the remainder of the trip just because he or she had complied with the rule governing movement from the first chosen lane of travel. See *State v. Walker*, 280 Kan. 513, 523, 124 P.3d 39 (2005) (courts construe statutes to avoid unreasonable results).

Moreover, the second directive in K.S.A. 8-1522(a) speaks to a vehicle being "moved from such lane." The "such" refers back to the first directive's "single lane," entirely within which the vehicle must have been traveling. K.S.A. 8-1522(a). Accordingly, the movement *from* a single lane of travel connotes a movement *to* another lane of travel, *i.e.*, a lane change, where the vehicle must again stay entirely within the lane markers. While the lane change is occurring, the single lane rule is, by necessity, not applicable and could not be an element of an improperly executed lane change.

In contrast to the continuing obligation mandated by the single lane rule, the second directive creates a momentary, one-time duty, *i.e.*, to ascertain that a lane change can be made with safety. After the lane change is completed, the second directive is no longer applicable. The driver's statutory obligation then reverts to complying with the single lane rule while traveling in the new lane. The legislature did not make safety a consideration with regard to the single lane rule. Pointedly, it explicitly conditioned compliance on practicability. Grafting the second directive's safety condition upon

the first directive's single lane rule would require us to rewrite the statute. See *State v. McElroy*, 281 Kan. 256, 262, 130 P.3d 100 (2006) (court should not add something that is not readily found in the statute or eliminate that which is readily found therein). Moreover, a driver should not be permitted to ascertain the safety of moving from a single lane and then proceed down the roadway astraddle a marker line in the new lane. Therefore, we find no support in the statute for conditioning a violation of the single lane rule upon proof that driving outside the lane markers was unsafe.

Perhaps by pointing out that the "as nearly as practicable" language in the statute "connotes something less than the absolute," 37 Kan. App. 2d at 129, *Ross* was suggesting that the admonition to drive entirely within a single lane was precatory, *i.e.*, a suggestion on the better practice. That notion is refuted by the statute's affirmative assertion that a vehicle *shall* be driven within a single lane. The language indicates an intention to define a "rule of the road," telling a driver where his or her vehicle must be placed when traveling upon a marked roadway. An interpretation of K.S.A. 8-1522(a) that requires proof of the second directive governing lane changes in order to find a violation of the first directive governing how to drive down a laned roadway would effectively eviscerate the single lane rule. See *Walker*, 280 Kan. at 523 (courts presume legislature does not intend to enact useless or meaningless legislation).

To summarize, we interpret K.S.A. 8-1522(a) as establishing two separate rules of the road. The first requires a driver to keep entirely within a single lane while traveling on a roadway with two or more clearly marked lanes. That rule is temporarily suspended when it becomes impracticable to stay within the lane markers and when the driver is properly effecting a lane change. Proof that driving outside the lane markers created no safety hazard is not a defense to the single lane rule. The second rule provides that before a driver may change lanes or move from the current lane of travel to another location, he or she must ascertain that the movement can be made with safety. A traffic infraction occurs under K.S.A. 8-1522(a) when either rule of the road is violated.

Having set forth what constitutes a traffic infraction under K.S.A. 8-1522, we turn to the question of whether Deputy Doudican articulated specific facts which would support a reasonable suspicion that Desiree Marx had committed such an infraction. Like the Court of Appeals below, we will restrict our analysis to the single lane rule. The State presented no evidence to establish that the officer had reasonable suspicion that Desiree was attempting to change lanes or move from her chosen lane of travel. Moreover, as documented in the district court's findings, the State presented nothing from which the court could determine that the officer had reasonable suspicion that the driver failed to ascertain that a lane change could not be made safely.

As part of its decision, the *Marx* panel declared that crossing the fog line, overcorrecting, and crossing the centerline is an "inherently unsafe maneuver." 38 Kan. App. 2d at 607. As we have noted, the statute does not make safety a part of the equation for determining a violation of the single lane rule. Further, the panel held that the district court erred "as a matter of law" in finding an absence of reasonable suspicion. 38 Kan. App. 2d at 608. We do not believe such a rigid rule of law is consistent with the analysis required to determine reasonable suspicion.

K.S.A. 8-1522(a) is not a strict liability offense. See *State v. Lewis*, 263 Kan. 843, 857, 953 P.2d 1016 (1998) (K.S.A. 21-3204 limits strict liability crimes to those situations where legislature has clearly indicated an intention to dispense with criminal intent). The express language employed—"as nearly as practicable"—contradicts the notion that any and all intrusions upon the marker lines of the chosen travel lane constitute a violation. As indicated in both *Ross* and *Marx*, one can conjure up a number of scenarios where maintaining the integrity of the lane dividing lines is impracticable, *e.g.*, weather conditions or obstacles in the roadway. However, the statute even dilutes the practicability standard. It does not say "when practicable" a vehicle will be driven entirely within a single lane. It only requires compliance with the single lane rule as *nearly* as practicable, *i.e.*, compliance that is *close* to that which is feasible. That statutory language tells us that a violation of K.S.A. 8-1522(a) requires more than an incidental and minimal lane breach.

Accordingly, contrary to the *Marx* panel's suggestion that the deputy's testimony that he observed the motor home cross the fog line, overcorrect, and cross the centerline ended the reasonable suspicion inquiry in the State's favor, a detaining officer must articulate something more than an observation of one instance of a momentary lane breach. Although the panel acknowledged that the State bears the overall burden of proving the lawfulness of the seizure, it said that it was the Marxes' responsibility to provide evidence of any "special circumstance," such as an obstacle in the road, which would make keeping within a single lane impracticable. *Marx,* 38 Kan. App. 2d at 608. It opined that the State is not required to prove a negative.

Ironically, that burden-shifting contradicts the panel's subsequent observation that even if Desiree had presented proof of "a legitimate defense for moving from her lane of traffic, such as to avoid an obstacle in the road, this would not invalidate the stop as long as Doudican reasonably believed in good faith that a traffic violation had occurred." 38 Kan. App. 2d at 609. That declaration recognizes that, in determining reasonable suspicion, the focus was on what Deputy Doudican knew, when he knew it, and whether the known facts provided him with a reasonable and good faith belief that a traffic infraction had occurred. If, for example, the deputy knew of special circumstances making it impracticable to stay within the lane markers, but effected the stop anyway, his suspicion of a traffic infraction would not have been reasonable. The Marxes could not provide that testimony; only the deputy could relate what he knew and what he believed. Clearly, then, the deputy's objectively reasonable belief is part and parcel of the State's burden to prove that the governmental intrusion was warranted. Here, the State failed to carry its burden.

As the district court articulated at the suppression hearing, the defendant's vehicle was not weaving back and forth time and time again, but rather the deputy only observed one instance where the motor home did not maintain a single lane. Further, the court found that no testimony was offered as to how far the motor home crossed either the fog line or the centerline. The court noted that the deputy had shared no information about the traffic conditions.

We would also observe that the deputy gave no testimony from which the court could even infer that it was practicable to maintain a single lane. Besides relating the path the motor home traveled, the only thing the deputy related was that Desiree told him the motor home was "hard to drive." Accordingly, from the record before us, we determine that the State failed to carry its burden of establishing that Deputy Doudican had a reasonable suspicion that the motor home was violating the provisions of K.S.A. 8-1522(a). The district court's suppression of the evidence is affirmed.

Affirmed in part and reversed in part.

* * * * *

DAVIS, J., concurring: I agree with the majority's ultimate conclusion that the district court correctly suppressed the evidence in question here because Deputy Doudican lacked reasonable suspicion to conduct the traffic stop and because the traffic stop was not done for public safety or out of community caretaking concerns. I write separately, however, because I believe that the majority's analysis of K.S.A. 8-1522(a) results in an unreasonable and unworkable standard for an officer to apply when determining whether there is reasonable suspicion to initiate a traffic stop for failing to maintain a single lane.

K.S.A. 8-1522(a) states: "A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety." The majority interprets this statute "as establishing two separate rules of the road." The first rule

"requires a driver to keep entirely within a single lane while traveling on a roadway with two or more clearly marked lanes. That rule is temporarily suspended when it becomes impracticable to stay within the lane markers and when the driver is properly effecting a lane change. Proof that driving outside the lane markers created no safety hazard is not a defense to the single lane rule."

The second rule described by the majority "provides that before a driver may change lanes or move from the current lane of travel to another location, he or she must ascertain that the movement can be made with safety." The majority concludes that a "traffic

infraction occurs under K.S.A. 8-1522(a) when either rule of the road is violated."

My trouble with the majority opinion lies not with its interpretation of this statute, but rather with its conclusion stemming from this interpretation that it was the State's burden to prove that the defendants failed to maintain a single lane despite the fact that it was not impracticable to do so.

There is no question that the standard articulated by the majority in this case would be the standard if this were a trial on the traffic violation itself. But this is not a hearing to determine whether a traffic violation occurred; instead, we are asked to consider whether it was *reasonable* for Deputy Doudican to suspect that a traffic violation had occurred and subsequently decide to initiate a traffic stop. See *State v. Anderson*, 281 Kan. 896, 901, 136 P.3d 406 (2006). These are two very different questions.

The majority correctly states that in order to effectuate a legal traffic stop, Deputy Doudican was required to demonstrate a reasonable and articulable suspicion that a traffic violation had occurred. See *Anderson*, 281 Kan. at 901; *State v. Morris*, 276 Kan. 11, 17, 72 P.3d 570 (2003). The United States Supreme Court has described a "reasonable suspicion" as " 'a particularized and objective basis' for suspecting the person stopped of criminal activity. [Citation omitted.]" *Ornelas v. United States*, 517 U.S. 690, 696, 134 L. Ed. 2d 911, 116 S. Ct. 1657 (1996). Reasonable suspicion is a lower standard than probable cause and requires a fact-centered inquiry based on the " 'totality of the circumstances.' " *Morris*, 276 Kan. at 24 (quoting *State v. Slater*, 267 Kan. 694, Syl. ¶ 2, 986 P.2d 1038 [1999]).

When an officer can articulate facts demonstrating a reasonable suspicion existed for the officer to suspect that the accused committed a crime (in this case, a traffic violation), the seizure is valid even though it may be pretextual. *Whren v. United States*, 517 U.S. 806, 813, 135 L. Ed. 2d 89, 116 S. Ct. 1769 (1996). Thus, when a reasonable suspicion exists to conduct a traffic stop, a court will not invalidate that stop on the basis of the officer's motives. *State v. DeMarco*, 263 Kan. 727, 733, 952 P.2d 1276 (1998).

Applying these standards, the Tenth Circuit Court of Appeals has explained that an "initial traffic stop is valid under the Fourth Amendment not only if based on an observed traffic violation, but also if the officer has a reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir. 1998). We have similarly espoused that although "[a] traffic violation provides an objectively valid reason to effectuate a traffic stop," the ultimate test for judging the validity of an initial stop of a moving vehicle is whether an officer has "articulable facts sufficient to establish reasonable suspicion under K.S.A. 22-2402(1) and *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968)." *Anderson*, 281 Kan. at 901.

The question before us is whether the deputy who conducted the traffic stop in this case acted *reasonably* in initiating that stop. Circumstances may arise, contrary to the majority's assessment, where an officer may reasonably conclude that a vehicle's single deviation from a single lane violates K.S.A. 8-1522(a). One such instance was considered by the United States District Court in *United States v. Jones*, 501 F. Supp. 2d 1284 (D. Kan. 2007). There, a highway patrol trooper observed a vehicle cross the fog line "by at least the width of a tire" while traveling down the interstate early in the morning. 501 F. Supp. 2d at 1285. The trooper initiated a traffic stop because he was concerned that "the driver was drowsy or sleepy based upon the swerve." 501 F. Supp. 2d at 1285. The court in *Jones* found that "[a]n extended trip, the likelihood of overnight travel, the pre-dawn hour, and the sudden swerve are enough, though just barely, for a reasonable suspicion that the driver was having difficulty staying awake as to justify a stop for safety reasons." 501 F. Supp. 2d at 1299.

I find the court's rationale in *Jones* to be sound and to exemplify why we employ a fact-specific inquiry in these cases. Officers' decisions as to whether reasonable suspicion exists, like the more stringent standard of probable cause, are " 'not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' [Citation

omitted.]" *Draper v. United States,* 358 U.S. 307, 313, 3 L. Ed. 2d 327, 79 S. Ct. 329 (1959).

The court in *Jones* may have determined after reviewing the evidence that a violation of K.S.A. 8-1522(a) did not actually take place (though it did not do so) for any number of reasons. For example, the court might conclude that the driver swerved to miss an animal or a pothole on the roadway. In other words, the driver could have presented evidence to the court that it was impracticable to stay in his or her lane. But this subsequent judicial determination would not necessarily undermine the reasonableness of the trooper's initial belief that a violation had occurred.

The practical effect of the majority's opinion in this case is to deprive the officer of discretion to determine, under the variety of circumstances that may arise on a multiple-lane roadway, whether a vehicle is violating the single-lane rule. While the majority is correct that K.S.A. 8-1522(a) is not a strict liability offense, it is nevertheless a rule of the road that must be followed and for which violations carry a penalty. Yet the majority's statements regarding the statute's flexibility—that the statute requires "compliance that is *close* to that which is feasible"—coupled with its requirement that the State prove a violation of the statute in order to establish reasonable suspicion creates a standard that will be difficult if not impossible for officers to enforce. I believe the effect of this decision will be hesitancy in, if not an all-out end to, the enforcement of the single-lane requirement. This result would, in my opinion, be contrary to the legislature's intention in enacting K.S.A. 8-1522(a).

The district court concluded that Deputy Doudican's testimony that the Marxes' motor home "crossed the fog line, . . . overcorrected[,] and crossed the center line" was insufficient to establish a reasonable suspicion that the Marxes violated K.S.A. 8-1522(a). I agree with this assessment. As noted by the majority, the officer provided no evidence other than this brief explanation (*e.g.,* evidence of traffic or weather conditions, time of day, or any other observation relating to the practicability of the momentary deviation) to explain his decision to initiate a traffic stop. In the absence of such evidence, it was unreasonable for the deputy to believe that

the motor home violated the single-lane rule. Because the deputy did not have a reasonable suspicion to support the initial traffic stop, I would affirm the district court's grant of the defendants' motion to suppress and, therefore, concur in the majority opinion.

MCFARLAND, C.J., joins in the foregoing concurring opinion.