NOT DESIGNATED FOR PUBLICATION

No. 120,948

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant/Cross-appellee*,

v.

LESMAY S. RIVERA,
*Appellee/Cross-appellant*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; MARK S. BRAUN, judge. Opinion filed November 20, 2020. Reversed and remanded with directions.

*Jodi Litfin*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellant/cross-appellee.

*Patrick H. Dunn*, of Kansas Appellate Defender Office, for appellee/cross-appellant.

Before ARNOLD-BURGER, C.J., MALONE, J., and WALKER, S.J.

PER CURIAM: Officer Josh Miller stopped Lesmay S. Rivera outside Topeka, Kansas, after witnessing him weave within his lane. Miller testified that he suspected Rivera was intoxicated or too tired to drive. After stopping Rivera, Miller requested backup and then spoke with Rivera at his vehicle. After questioning Rivera about his travel plans, Miller had Rivera exit the vehicle to determine if he displayed signs of intoxication. After a couple of minutes at the back of the vehicle, the backup officer asked Rivera more questions about his travel plans. Miller returned Rivera to his vehicle and told him he was free to go and took a step back.

1

Miller then reengaged with Rivera and asked if he could ask a few more questions. Rivera agreed and ultimately agreed to a search of the vehicle. A large amount of methamphetamine was found in the vehicle.

Rivera moved to suppress the evidence and the district court denied the motion. Rivera proceeded to a bench trial on stipulated facts and was found guilty. The district court granted a departure sentence. The State and Rivera appeal. Because we find that Miller lacked reasonable suspicion to stop Rivera, we reverse his convictions and remand the matter for further proceedings.

FACTUAL AND PROCEDURAL HISTORY

A grand jury indicted Rivera on three felony counts:  possession with intent to distribute more than 100 grams of methamphetamine; unlawful use of drug paraphernalia; and aggravated endangering of a child. The indictment was based on evidence recovered after a traffic stop.

*The Stop and Search*

On October 24, 2017, Topeka Police Officer Miller saw a silver Infiniti swaying between lanes on I-70. Miller testified that the vehicle touched and crossed on top of the center line three times and went back to the right shoulder of the road at least once. After seeing that, Miller thought that the driver might be impaired or tired. Miller stopped the vehicle.

Miller called for Officer Joshua Heaslett as backup because he knew Heaslett was nearby. Miller then spoke with the driver of the Infiniti, Rivera. Rivera's wife, Zulema Cimentada, and his 15-year-old stepdaughter were also in the vehicle.

Miller approached Rivera and asked for his information. He learned the vehicle was a rental and also requested the rental information. While Rivera was finding his documents, Miller asked where they were coming from and where they were going. The vehicle had a California tag and Rivera indicated that they were heading back to Miami, Florida, after leaving Las Vegas, Nevada. After getting Rivera's information, Miller ran checks on it and learned that Rivera did not have any warrants and that the vehicle was not stolen.

While Miller was running Rivera's information through the computer system, Heaslett was speaking with Rivera and his wife. Heaslett came back to Miller's vehicle and said that he had learned that Rivera and his family flew to Las Vegas but decided to drive back to Miami. According to Heaslett, while they were speaking, Rivera appeared nervous, would not look at Heaslett while they were talking, and made Heaslett repeat simple questions. While Miller was speaking with Rivera, he noticed that Rivera seemed nervous and did not have an answer when asked why they were going through Kansas to get to Miami from Las Vegas. Rivera also indicated that they picked up the vehicle on October 21 and stayed in Las Vegas for a few days. Miller thought this was odd since it was just three days later when he pulled them over.

Miller requested that Rivera exit the vehicle. Miller explained, at a later hearing, that his purpose was to make sure that Rivera was able to stand and walk without displaying signs of inebriation. Miller saw that Rivera was able to stand and walk properly and had him get back in his vehicle. Miller went to the passenger side of the vehicle and returned Rivera's documents. Miller told Rivera that he was free to go and took "a step back." After Rivera touched the gearshift, Miller reintroduced himself and asked if he could ask him a few questions.

According to Miller, he asked once and Rivera agreed to answer some questions. Miller then asked Rivera if there was anything illegal in the vehicle, such as guns or

3

drugs. Miller asked whether there was any heroin in the vehicle and Rivera looked at Miller and said, "'No.'" But when Miller asked whether there was any methamphetamine in the vehicle, Rivera "looked down and away" and "very quietly said, '[n]o.'" Based on his response, Miller thought the vehicle might contain methamphetamine.

Miller then asked, once, whether Rivera would consent to a search of the vehicle and Rivera stated that he would. Miller had Rivera and his family get out of the vehicle and stand by the front passenger bumper of Miller's vehicle. Heaslett then started searching the Infiniti. Heaslett discovered an STP air filter box with a large bag inside it which was covered in axle grease. Inside that bag was another bag with more grease. Inside the second bag was another bag which contained a white crystalline substance which was later determined to be methamphetamine.

After discovering the methamphetamine, Miller called for additional units to transport Rivera and his family to the police station and had the Infiniti towed so that it could be fully searched. A second bag of methamphetamine was located in a green soft cooler.

When cross-examined by defense counsel, Miller explained that he was unable to record the traffic stop because his body camera's battery was dead. Miller thought that it took about three to five minutes to get Rivera's documents and ask him some preliminary questions. While speaking with Rivera, Miller did not notice any indications that Rivera was under the influence of drugs or alcohol. Heaslett arrived shortly after Miller got Rivera's driver's license.

According to Miller, when he requested that Heaslett provide backup, he informed Heaslett that the stop was a possible drug interdiction stop. At the time Miller provided that information, he knew that the vehicle had an out of state tag and was a rental vehicle.

4

Miller then explained that he became more suspicious after asking Rivera additional questions about his travel plans. However, Miller denied asking Rivera to exit the vehicle based on his answers to those questions. Instead, Miller asked Rivera to exit the vehicle based on the driving infractions he had witnessed before the stop. When pressed about the driving infractions, Miller explained that he saw the Infiniti ride on the center line for a few seconds on three occasions. Additionally, Miller explained that the Infiniti touched the shoulder and then came back over to the center line. The Infiniti never went into another lane.

After Rivera exited the car, Miller did not have him undergo field sobriety testing. According to Miller, Rivera was able to exit the vehicle without stumbling and walked directly to him. Given that, Miller did not think field sobriety tests were necessary.

Miller estimated that from the time he stopped the vehicle to the time Rivera was allowed to return to his vehicle took 10 to 12 minutes. After Rivera got into his vehicle, Miller waited until Rivera was ready to drive away and then asked for consent to search the vehicle. Miller testified that Rivera immediately responded that Miller could search the vehicle.

Heaslett's body camera was working for part of the encounter but stopped working shortly after Miller had Rivera exit the vehicle the first time. At one point, Heaslett asked Rivera why they decided to drive back. Rivera explained that he wanted to show his stepdaughter the country.

According to Rivera, Miller did not tell him why he was stopped. Nor did he remember weaving in his lane. Rivera also said that Miller asked to search his vehicle several times and that he originally did not consent to Miller searching his vehicle. However, Rivera indicated that he ultimately agreed to have his car searched because he thought Miller would not let him leave if he did not consent. According to Rivera, he was

5

never returned to the vehicle and the officers were asking him for consent to search after he was initially removed.

Later, Miller interviewed Rivera at the Topeka Law Enforcement Center. Miller provided written *Miranda* rights and also read the *Miranda* rights to Rivera. Rivera indicated that he understood his rights and agreed to speak with Miller. According to Rivera, he was given the box containing the methamphetamine and was told to give it to a family member back in Miami. Rivera said that he did not open the box to see what was inside. Rivera indicated that he was not being paid to make the delivery. Rivera did say that he purchased a green soft cooler at a Walmart during the trip.

*The Motion to Suppress*

The above information was presented to the district court in a motion to suppress. After the evidence was presented, the court continued the hearing to allow written arguments and set additional oral arguments for a later date. A video of Rivera's interview with law enforcement was also admitted.

After hearing arguments from both sides, the district court issued a written ruling. The district court noted the conflicting testimony between Rivera and the officers and the fact that the periods of conflicting versions of events was not recorded by police body cameras. The court found that Miller witnessed Rivera weave onto the center line three times and also weave onto the shoulder. The court went on to note Miller's testimony regarding Rivera's consent to search, but also acknowledged Rivera's testimony that he did not consent.

The district court found Miller's testimony more credible. The court went on to decide that Miller did not extend the scope of the stop in an effort to secure consent to search. Ultimately, the court determined that Rivera consented to a search of his vehicle.

6

Further, the court found that Rivera knowingly and voluntarily waived his rights when Miller was questioning him at the law enforcement center.

Rivera filed a motion to reconsider which the court denied before trial.

*The Trial and Sentencing*

On the day of the scheduled jury trial, Rivera and the State agreed to proceed by a bench trial on stipulated facts. Rivera stipulated that he was stopped by police and over 100 grams of methamphetamine were located, in vacuum-sealed bags, in his rental vehicle. He also stipulated that he was delivering the methamphetamine to a family member. Additionally, he stipulated that his stepdaughter, who was 15 years old at the time, was present in the vehicle.

The court found Rivera guilty on all counts. Prior to sentencing, Rivera moved for a durational and dispositional departure. Rivera argued that a departure was appropriate because he: (1) "takes full responsibility for his actions," (2) "has no criminal history," (3) cooperated with investigators, (4) had already been incarcerated for 15 months, (5) would be a productive member of society if granted probation, (6) should be sentenced to a similar amount as his wife, who was granted probation after a plea deal, and (7) would not object to a lengthy underlying prison term.

At sentencing, it was undisputed that Rivera had a criminal history score of I, meaning no criminal history. Rivera continued to assert the same arguments seeking a departure sentence. In particular, Rivera noted that he "did not force the State to bring in witnesses, to bring in evidence" and instead had a trial on stipulated facts. Rivera equated this with taking a plea but noted that he wanted to leave "open the opportunity to appeal the suppression order." Finally, Rivera's counsel pointed out that Rivera's

7

"plan to retain me was due to the appeal but considering him not having to appeal it, if he's granted probation, you know, I don't want to say he would—he is or he is going to forego his right to appeal or not. But I do say the one thing is we could get some finality if this is on probation with, you know, just having people move forward."

The district court granted Rivera's motion for a durational departure. On Count 1, the possession with intent to distribute count, the court sentenced Rivera to 36 months' imprisonment, as opposed to the standard sentence of 146 months' imprisonment. The court stated that it was doing so for two reasons. First, "the Court does believe that while I don't want to be naive enough to know that the stipulated facts was probably to get toward an appeal faster, but the defendant has demonstrated acceptance of responsibility." The second factor the court relied on was "the lack of any criminal history by the defendant."

The court then sentenced Rivera to the standard 11-month sentence for the possession of paraphernalia conviction, to be served concurrent to Count 1. On the final charge, aggravated endangering of a child, the court imposed the standard six-month sentence to be served consecutive to Count 1. Ultimately, Rivera had a controlling 42-month sentence.

Both parties filed timely notices of appeal.

ANALYSIS

On appeal, Rivera argues that the district court erred when it declined to suppress the evidence resulting from Miller's stop because Miller lacked grounds for the stop. Alternatively, Rivera argues that the evidence should have been suppressed because Miller illegally extended the duration of the stop and Rivera did not voluntarily consent to a search of the vehicle.

The State argues the district court was correct in its ruling on the motion to suppress. But the State argues that the district court erred by granting a durational departure because the factors were not supported by substantial competent evidence or, alternatively, were not substantial and compelling reasons to depart.

*Officer Miller lacked reasonable suspicion to stop Rivera.*

Rivera argues that Miller's testimony established that he never saw Rivera commit a traffic infraction, therefore, Miller lacked reasonable suspicion to stop Rivera. We agree.

*Our standard of review is mixed.*

The standard of review for a district court's decision on a motion to suppress has two components. The appellate court reviews the district court's factual findings to determine whether they are supported by substantial competent evidence. The ultimate legal conclusion, however, is reviewed using a de novo standard. In reviewing the factual findings, the appellate court does not reweigh the evidence or assess the credibility of witnesses. *State v. Hanke*, 307 Kan. 823, 827, 415 P.3d 966 (2018).

The State bears the burden of establishing that a warrantless search and seizure was lawful. 307 Kan. at 827.

*A violation of K.S.A. 8-1522(a) requires more than an incidental and minimal lane breach.*

An officer may perform a traffic stop if he or she reasonably suspects that the driver committed a traffic infraction. *City of Norton v. Wonderly*, 38 Kan. App. 2d 797, 802-03, 172 P.3d 1205 (2007). Reasonable suspicion is "a specific, objective, articulable

9

basis for believing that the person being detained is committing, has committed, or is about to commit a crime." *State v. Kraemer*, 52 Kan. App. 2d 686, 692, 371 P.3d 954 (2016). Whether an officer had reasonable suspicion is a question of law. *State v. Lowery*, 308 Kan. 359, 364, 420 P.3d 456 (2018). If an officer initiated a traffic stop without reasonable suspicion that the driver was committing a traffic infraction or a crime, then the evidence discovered during that stop may be suppressed under the exclusionary rule. See *State v. Powell*, 299 Kan. 690, 694-95, 325 P.3d 1162 (2014).

Here, Rivera argues that Miller did not have a reasonable suspicion that he committed a traffic infraction by violating K.S.A. 8-1522(a). Under K.S.A. 8-1522(a), "[a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety."

The Kansas Supreme Court has interpreted K.S.A. 8-1522(a)

> "as establishing two separate rules of the road. The first requires a driver to keep entirely within a single lane while traveling on a roadway with two or more clearly marked lanes. That rule is temporarily suspended when it becomes impracticable to stay within the lane markers and when the driver is properly effecting a lane change. Proof that driving outside the lane markers created no safety hazard is not a defense to the single lane rule. The second rule provides that before a driver may change lanes or move from the current lane of travel to another location, he or she must ascertain that the movement can be made with safety." *State v. Marx*, 289 Kan. 657, 673, 215 P.3d 601 (2009).

A traffic infraction occurs if either rule is violated. 289 Kan. at 673. The court went on to state that "a violation of K.S.A. 8-1522(a) requires more than an incidental and minimal lane breach." 289 Kan. at 674.

10

The holding in *Marx* has been applied multiple times by this court. For example, in *State v. McGregor*, No. 107,855, 2013 WL 1010590 (Kan. App. 2013) (unpublished opinion), an officer witnessed McGregor's driver's side tires touch the center line once and touch the fog line two or three times. In addition, the officer saw McGregor's tires travel outside the fog line for a few seconds.

On appeal, this court determined that there was sufficient evidence to uphold McGregor's conviction under K.S.A. 8-1522 because the body of McGregor's vehicle crossed the line when her tires rode on the line. That, coupled with the multiple occasions where McGregor touched the line, was enough to show that McGregor went beyond an incidental and minimal lane breach. While reaching its decision, this court noted that the officer "saw no reason McGregor could not maintain driving within her lane." 2013 WL 1010590, at *4. Given all these factors, the court upheld McGregor's conviction under K.S.A. 8-1522. 2013 WL 1010590, at *4.

In *State v. Eisenhauer*, No. 103,951, 2011 WL 767862 (Kan. App. 2011) (unpublished opinion), this court affirmed a district court's decision to grant a motion to suppress based on an officer's lack of reasonable suspicion that Eisenhauer violated K.S.A. 8-1522(a). In *Eisenhauer*, the defendant "traveled for several seconds straddling the westbound lanes with its driver's side tires in the left lane." 2011 WL 767862, at *1. After driving, partially, in the left lane, Eisenhauer drifted back to the right and nearly touched the curb. He then drifted left again but did not cross the line. After drifting right and then left once more, he was pulled over by police.

On appeal, this court reasoned that suppression of the evidence was correct because "Eisenhauer drove entirely within his lane of travel except on one occasion when the driver's side tires briefly crossed the lane marker." 2011 WL 767862, at *4. The brief period that Eisenhauer was in the other lane was not enough to "provide the officer reasonable suspicion to make the traffic stop that led to Eisenhauer's arrest" because it did

11

not amount to more than an incidental and minimal lane breach. 2011 WL 767862, at *4. Additionally, this court noted that the "roadway was dry and clear of obstructions or potholes"; however, the court did not rely on that fact in the analysis. 2011 WL 767862, at *1, 4.

In *State v. Miles*, No. 114,544, 2017 WL 383790 (Kan. App. 2017) (unpublished opinion), this court addressed whether a single lane breach was enough to create a reasonable suspicion that a driver violated K.S.A. 8-1522(a) when the magnitude of the breach was significant. In *Miles*, the officer testified that he witnessed Miles' car drift into the left lane so much that at least half the car was over the center line. The officer noted that there were no obstructions or hazards that would explain Miles' movement. The officer pulled Miles over for violating K.S.A. 8-1522(a).

On appeal, this court held that the officer had reasonable suspicion to believe that Miles violated K.S.A. 8-1522(a) based on his observations. The court noted that although there was testimony that Miles only breached the lane line a single time, that one breach was significant. 2017 WL 383790, at *7. The magnitude of the breach, coupled with the officer's testimony that the weather conditions were clear on the night of the stop and that there were no hazards or obstructions which necessitated Miles moving out of the way, provided the officer with reasonable suspicion that Miles was violating the law. 2017 WL 383790, at *8.

Overall, we find that there was insufficient evidence here to support a finding that Miller had a reasonable suspicion that Rivera violated K.S.A. 8-1522(a). First, it should be noted that Miller himself did not state that he pulled over Rivera for violating K.S.A. 8-1522(a). Instead, Miller pulled Rivera over because he "was thinking possibly either an impaired driver or the driver was possibly tired."

12

Second, Miller testified that he only saw Rivera drive on the center line for a few seconds on three occasions. In addition, Rivera touched the fog line but did not ride on top of it. While the testimony establishes that Rivera weaved within his lane on multiple occasions, that does not necessarily mean that Rivera did more than an "incidental and minimal lane breach." *Marx*, 289 Kan. at 674. In this case, Rivera did less than the defendant in *Eisenhauer*. In *Eisenhauer*, the defendant actually crossed the line and drove in another lane, albeit for a short period and only once. 2011 WL 767862, at *4.

Finally, it is important to remember that the State bears the burden of proving that a warrantless search and seizure was lawful. *Hanke*, 307 Kan. at 827. As several cases have noted, roadway or weather conditions can at least play a role in whether a driver is required to stay in one lane. See generally *Marx*, 289 Kan. at 674-75 (noting that the requirements of K.S.A. 8-1522[a] may yield to the necessity of adjusting to weather conditions or moving out of the way of obstacles in the roadway). In this case, the only testimony provided by the State regarding the weather or state of the roadway was testimony from Heaslett, who did not see Rivera weaving in his lane. When asked about the conditions during the stop, Heaslett replied that they "were clear, it was dark." But that limited testimony tells this court nothing about the condition of the roadway where Rivera was seen weaving within his lane. As stated by the court in *Marx*, 289 Kan. at 674, "one can conjure up a number of scenarios where maintaining the integrity of the lane dividing lines is impracticable."

Given the limited amount of weaving that Miller saw Rivera doing, his stated reasons for pulling Rivera over, and the lack of testimony regarding roadway conditions at the time, Miller did not have a reasonable suspicion that Rivera violated K.S.A. 8-1522(a) and could not stop him for violating that law. However, the State also argues that Miller had reasonable suspicion to pull Rivera over for driving while impaired or tired.

13

*Officer Miller lacked reasonable suspicion to conclude that Rivera may be impaired.*

In support of its argument, the State cites *State v. Field*, 252 Kan. 657, 661, 847 P.2d 1280 (1993), where the Kansas Supreme Court noted that an officer may stop a vehicle for "'[s]afety reasons alone . . . if the safety reasons are based upon specific and articulable facts.'" In response, Rivera argues that such a stop would be akin to a community caretaking or public safety stop and that those stops must be unrelated to any investigative purpose. In support, Rivera cites to *State v. Morales*, 52 Kan. App. 2d 179, 183, 363 P.3d 1133 (2015) (quoting *City of Topeka v. Grabauskas*, 33 Kan. App. 2d 210, 214-15, 99 P.3d 1125 [2004]), where this court noted that public safety stops "are to be 'totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'"

*Field* and *Morales* point to two ways to look at this argument. First, we could view Miller's actions as those of an officer seeking to determine whether an individual was driving while intoxicated. If we look at the issue that way, the question is whether Miller had reasonable suspicion to stop Rivera for driving while intoxicated. Alternatively, we could view Miller's actions under a public safety lens and determine whether Miller's actions were appropriate. The first view would mesh with Miller's statement that after seeing Rivera swerve, he thought he might be impaired. The second view would relate to Miller's statement that he thought Rivera might be tired. See *Field*, 252 Kan. at 664 (noting that public safety stop doctrine was not controlling where officer suspected driver was driving under the influence of drugs or alcohol).

The State focuses on the first view. The State points to *State v. Hamman*, 273 Kan. 89, 96, 41 P.3d 809 (2002), where the Kansas Supreme Court held that an officer seeing a driver sway from side to side in its lane two or three times could furnish suspicion that the driver was intoxicated. However, the officer did not pull over the vehicle immediately

14

and instead followed it for a short time. Soon, the officer watched as the driver made a right turn, saw the vehicle go off the left side of the road, struggle to return to the road, and when the vehicle returned to the road it drove on the far-right side, almost in the ditch.

The State also points to *Field*, where an officer witnessed a vehicle weave from the middle of its lane to the outside of the lane five times within five blocks. The Kansas Supreme Court ruled that the officer's subsequent stop of the vehicle was justified because the officer had shown "'articulable facts sufficient to constitute reasonable suspicion.'" 252 Kan. at 659.

But given that the burden of proof lies with the State, there is insufficient evidence to show that Miller had a reasonable suspicion that Rivera was driving while intoxicated. Miller testified that Rivera weaved within his lane three times, but there were no other indications of intoxicated driving. This is not a situation like that in *Hamman*, where the driver weaved while driving and then drove alongside a ditch. See 273 Kan. at 90. Likewise, it differs from the facts of *Field*. In *Field* the stop occurred around 2 a.m., as opposed to the 7:40 p.m. stop in this case. Additionally, Miller followed Rivera for a few miles after seeing him swerve and did not report any other indications of intoxicated driving, as opposed to the officer in *Field* who pulled the driver over within a few blocks. See 252 Kan. at 658.

The slight weaving within the lanes, in combination with the time and lack of other indications of intoxication, does not provide sufficient evidence that would give Miller reasonable suspicion that Rivera was intoxicated. Additionally, the factors relevant in the previous analysis, namely the lack of any testimony that would preclude another explanation for the weaving such as wind or debris in the road, weigh against the State here.

15

*Officer Miller did not conduct a valid public safety stop.*

The second view, that Miller stopped Rivera as part of a public safety or community caretaking stop, is likewise unconvincing. As Rivera points out in his brief, a public safety stop should be divorced from any sort of investigation. See *Morales*, 52 Kan. App. 2d at 183. To determine whether a safety stop runs afoul of the Fourth Amendment to the United States Constitution's protections, Kansas courts employ a three-part test. First, courts determine whether the officer has "'objective, specific, and articulable facts from which a law enforcement officer would suspect that a citizen is in need of help or is in peril.'" *State v. Messner*, 55 Kan. App. 2d 630, 635, 419 P.3d 642 (2018) (quoting *Morales*, 52 Kan. App. at 182). "'Second, the officer may take appropriate action to render assistance if the citizen is in need of aid.'" *Messner*, 55 Kan. App. 2d at 635 (quoting *Morales*, 52 Kan. App. at 182). Third, if the officer determines that the citizen does not need assistance, any further actions by the officer constitute a seizure and implicate the protections provided by the Fourth Amendment. *Messner*, 55 Kan. App. 2d at 635.

Just by looking at the second part of the test, Miller's actions after the stop should preclude any thoughts that his stop was purely for public safety. After stopping Rivera, Miller did not take actions that could be characterized as determining whether Rivera needed assistance and then rendering the needed assistance. Miller told Heaslett that he was making a possible interdiction stop. And instead of questioning Rivera about whether he was feeling unwell or tired, Miller immediately began questioning Rivera about his travel plans, took his information, and requested a warrant check on Rivera. By doing so, Miller runs afoul the rule that a public safety stop should be divorced from any investigative purpose. See *Messner*, 55 Kan. App. 2d at 637.

Under either view, Miller was unable to stop Rivera, question him, and eventually seize him and search his property without running afoul of the protections provided by

the Fourth Amendment. Given that, the district court erred when it denied Rivera's motion to suppress.

*The State abandons any claim that Rivera's consent to search purged the taint of the illegal stop.*

As we said in the beginning, if an officer initiates a traffic stop without reasonable suspicion that the driver was committing a traffic infraction or a crime, then the evidence discovered during that stop may be suppressed under the exclusionary rule. See *Powell*, 299 Kan. at 694-95. The exclusionary rule requires the suppression of not only the evidence obtained as a direct result of the illegal search, but evidence later discovered as "the so-called '"fruit of the poisonous tree."'" *State v. Ellis*, 311 Kan. 925, 933, 469 P.3d 65 (2020). But as with most judicially created rules, there are exceptions. These exceptions generally involve the causal relationship between the unconstitutional act and the discovery of evidence. One of these exceptions, the attenuation doctrine, holds:

> "Evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" *Utah v. Strieff*, 579 U.S. ___, 136 S. Ct. 2056, 2061, 195 L. Ed. 2d 400 (2016).

Here, the district court found, and the State argues, that Rivera voluntarily consented to the search of his car. One recognized exception to the warrant requirement is consent. *State v. Estrada-Vital*, 302 Kan. 549, 556, 356 P.3d 1058 (2015). The State then assumes that due to this consent, the exclusionary rule does not apply. But the State provides no explanation for why it does not apply. The district court had no need to consider the exclusionary rule or the attenuation doctrine as it related to Rivera's subsequent consent because it found the stop to be constitutional. Instead, the State has one sentence in its brief, "[e]ven if this Court finds the traffic stop was not lawful,

17

Rivera's consent to additional questioning and to search purges the taint of an illegal detention." It cites to *State v. Reason*, 263 Kan. 405, 409, 951 P.2d 538 (1997), *abrogated on other grounds by State v. Berreth*, 294 Kan. 98, 273 P.3d 752 (2012), for support, with no explanation of how the facts of *Reason* resemble the facts of this case. In fact, they don't.

In *Reason*, the Kansas Supreme Court found the police contact with Reason was a voluntary encounter from the beginning. Therefore, there was no unlawful seizure. His continued detention while police checked his identity was also not unreasonable or unlawful. So his subsequent consent to search his vehicle was not tainted by any prior illegality. 263 Kan. at 412-13. The attenuation doctrine did not even come into play. "There is no taint to purge from the consent if there was no illegal detention." 263 Kan. at 410.

If the contraband discovered after Rivera gave consent to search is admissible it is only because of the application of the attenuation doctrine. The United States Supreme Court in *Strieff* required more of a showing from the State than a simple statement that consent purges the taint of the illegal stop. It requires the evaluation of three factors:

> "First, we look to the 'temporal proximity' between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search. Second, we consider 'the presence of intervening circumstances.' Third, and 'particularly' significant, we examine 'the purpose and flagrancy of the official misconduct.' [Citations omitted.]" *Strieff*, 136 S. Ct. at 2062.

See also *Brown v. Illinois*, 422 U.S. 590, 603-04, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975) (the first case to set out the three factors for attenuation); *State v. Tatro*, 310 Kan. 263, 269-71, 445 P.3d 173 (2019) (discussing and later applying the three-part test from *Strieff* and *Brown*).

18

Here the State fails to address the three *Strieff* factors at all and does not even mention the word attenuation in its brief. We find the State has abandoned any argument that the attenuation doctrine would allow admission of any evidence obtained after Rivera consented to the search of his vehicle. See *State v. Salary*, 309 Kan. 479, 481, 437 P.3d 953 (2019) (failure to support a point with pertinent authority or show why it is sound despite a lack of supporting authority or in the face of contrary authority is akin to failing to brief the issue); *State v. Lowery*, 308 Kan. 1183, 1231, 427 P.3d 865 (2018) (a point raised incidentally in a brief and not argued therein is also deemed abandoned).

Accordingly, we reverse Rivera's convictions and remand for further proceedings. Because we are reversing Rivera's convictions, we need not address the State's cross-appeal regarding the district court's grant of a departure motion at sentencing.

Reversed and remanded with directions.